IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS

---

JANE DOE,

     Plaintiff,

V.                                                    No. _____

                                       JURY TRIAL DEMANDED

RHODES COLLEGE,
DAVID CADDLE, AMAKA MGBOH,
AND RICHARD ADAMS,

     Defendants.

---

**VERIFIED COMPLAINT**

---

Plaintiff Jane Doe[1] files this Complaint and for her causes of action states as follows:

**<u>NATURE OF ACTION</u>**

1.   This action seeks injunctive relief from Rhodes College's suspension of Plaintiff for alleged violation of  the Standards of Conduct for the Rhodes Community and for compensatory damages.

2.   This action also seeks relief pursuant to Tennessee Code Annotated Section 4-21-311 (THRA) which states:

    (a) Any person injured by any act in violation of this chapter shall have a civil cause of action in chancery court or circuit court.

    (b) In such an action, the court may issue any permanent or temporary injunction, temporary restraining order, or any other order and may award to the plaintiff actual damages sustained by such plaintiff, together with the costs of the

---

[1] Plaintiff proceeds using a pseudonym to protect sensitive personal and medical information and other underlying health conditions and for privacy as set forth more fully infra. Plaintiff will file a separate Motion to Proceed by Pseudonym.

lawsuit, including a reasonable fee for the plaintiff's attorney of record, all of which shall be in addition to any other remedies contained in this chapter.

Tenn. Code Ann. § 4-21-311 (West).

## PARTIES

3.      Plaintiff is a citizen of Virginia and presently a student of Rhodes College, having first matriculated in 2019. Plaintiff suffers from Attention Deficit Hyperactivity Disorder (ADHD) which causes her to act without thinking and overlook social cues. Plaintiff's processing speed is much lower than one would predict for a young adult with advanced reasoning abilities, and as a result of this, she takes longer to fully demonstrate her knowledge and capability.

4.      Defendant Rhodes College ("Rhodes College" or "Rhodes") is a private, four-year, co-educational, residential liberal arts college with its principal place of business located at 200 North Parkway, Memphis Tennessee. Rhodes College's registered agent is Charles F. Newman and he may be served at 130 N. Court, Memphis, TN  38103.  Defendant is aware of Plaintiff's ADHD diagnosis and has made certain accommodations.

5.      Defendant David Caddle ("Caddle") is a citizen of Mississippi and a student at Rhodes and serves as the President of the Community Standards Council ("CSC").

6.      Amaka MgBoh ("MgBoh") is a citizen of Tennessee and a student at Rhodes College and is employed by Rhodes College as a Resident Advisor.

7.      Defendant Richard D. Adams ("Adams") is a citizen of Tennessee and an employee of Rhodes College as Director of Community Standards, Division of Student Life.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction pursuant to 28 USC §1332, there is complete diversity and the amount in controversy exceeds $75,000.00. The Court has supplemental jurisdiction under Tennessee Code Annotated Section 4-21-101 *et. seq.*

2

9.     The United States Western District of Tennessee provides proper venue for this action because all of the events giving rise to Plaintiffs' claims occurred in Shelby County, Tennessee within this District.

## PLAINTIFF TO PROCEED UNDER PSEUDONYM

10.     Plaintiff should be allowed to proceed in this matter under a pseudonym. The practice of proceeding under pseudonyms is well within the Trial Court's discretion. *Campbell v. Sundquist*, 926 S.W.2d 250 (Tenn. App. 1996); *Doe v. HCA Health Services of Tennessee, Inc.*, 46 S.W.3d 191 (Tenn. 2001).

## FACTS

11.     On October 3, 2021, early in the morning, a Rhodes College student was shot and killed during a home invasion that occurred off campus and there were additional break-ins to off-campus student homes within the preceeding 12 hours.

12.     A Rhodes Campus Safety Alert was issued at 10:53 p.m. informing students that the Memphis Police Department identified a suspect in the shooting of the Rhodes student.  The safety alert identified the suspect as a 6'2'' Black man.

13.     Plaintiff returned to campus after a weekend away without cellphone service on the evening of October 3, 2021.

14.     Upon returning to campus and turning her phone on, Plaintiff learned of the targeted incidents towards Rhodes' students and feared for her former roommate's safety who lived off campus.

15.     In response to seeing the Rhodes Campus Safety Alert describing the suspect as a Black man, Plaintiff impulsively sent a text message at 11:21 p.m. to her former roommate, who lived off campus near where the home invasion and shooting occurred.  The text message stated:

"Imma be racist: If you see a black man in the next 24hrs near your house hit him with your car." The phrase "hit him with your car" was a facetious phrase commonly used between the Plaintiff and her former roommate and was not to be taken literally.

16.     Her former roommate took a screenshot of the text message and sent it to Amaka MgBoh, an employee of Rhodes College as a Resident Advisor, seeking advice on how to respond to the text message.

17.     MgBoh, upon seeing the screenshot of the text message, texted Plaintiff at 11:28 p.m. the following message: "You racist af for what you texted brit.  Fuck you."

18.     Plaintiff responded to MgBoh's text message at 11:29 p.m., explaining why she sent the message.  Among other clarification, the Plaintiff explicitly stated, "So yes if she sees someone suspicious on her street that matches the description I think she should report it. Not literally hit him with her car." Plaintiff followed up her explanation with an apology: "But yes, the way I phrased what I said was racist and I should have thought more before I sent it.  I am sorry as I try to be more respectful and understanding in how I view others but that was not the case here."

19.     Plaintiff, at 11:35 p.m., sent an apology to her former roommate, which stated: "I'm sorry I was insensitive for my words.  What I said was wrong and I could have said it better but im scared for you right now.  And in Campos email they said there might be a group of people helping the suspect."

20.     After texting with both MgBoh and her former roommate, Plaintiff turned her phone off and went to sleep.

21.     MgBoh posted a screenshot of the text the Plaintiff had sent to her former roommate on Snapchat, but the screenshot did not include the apology Plaintiff sent to her.

4

22.     On information and belief, MgBoh also sent screenshots of Plaintiff's text directly to several of MgBoh's friends.

23.     Other students saw the Snapchats that MgBoh posted and became angry with Plaintiff, sending Plaintiff harassing text messages, sharing the screenshots of text messages on Instagram, and filing BERS (Bias Education Reporting System) reports against Plaintiff.

24.     When Plaintiff woke up the next morning, she discovered that her private text message she had sent to her former roommate was posted on Snapchat and Instagram.  Plaintiff had several harassing text messages from students who saw the post.

25.     One student texted Plaintiff at 1:08 a.m. on October 4: "Anyways, you've been reported to BERS.  The fact that you feel like the inbox of a black woman is a safe space to be racist is already disgusting, but already your excuse for racially profiling doesn't make me think much of you."

26.     Plaintiff responded to this student at 7:50 a.m.: "You're right what I did was wrong and I know that and I will except the punishment that come from my actions.  I did not think of the hurt my words have and how they impact the black community and I need to continue to educate myself and change to support my peers of color both locally and globally."

27.     Plaintiff, at 9:11 a.m. on October 5, issued the following public apology on her Instagram account: "Fellow students, staff and faculty, I am so profoundly sorry for my ignorance and blatant display of racism in response to the tragedy that affected our campus this weekend. What I said was wrong and disrespectful to the black community of Rhodes.  I apologize for the hurt I have caused and am educating myself to provide support rather than harm.  I am so sorry I have let down my friends, peers, and Rhodes as a whole.  I have learned that my actions hurt many people I love and respect and I sincerely apologize."

28.     On October 5,2021, in addition to issuing an apology, the Plaintiff also requested a meeting with Ms. Rodriguez, the Dean of Equity and Engagement in the Division of Student Life, to discuss ways she could learn and address the situation.

29.     Plaintiff had already made arrangements to attend an Anti-Black Bias Forum, which she did on October 25,2021 and did her own research to further understand the impact of her words and actions.

30.     On October 13, 2021, Plaintiff received an email from David Caddle, the Community Standards Council President, informing her that she was under investigation for alleged violations of Rhodes' Standards of Conduct.  The email also informed Plaintiff that she has the right to a Community Standards Council Advisor who "will serve as your advocate through the process."  Plaintiff blindly chose a sophomore student as her advisor from a list provided by the CSC . Of note, both the CSC President (D. Caddle) and a CSC secretary were listed as potential advisors for the Plaintiff  in direct violation of the CSC Constitution Article IV, section 1 (D)

31.     The Community Standards Council Constitution provides in Article IV, Section 1(D): "The Advisor's role is limited to answering any questions about those procedures.  The Advisor is foremost a member of the Community Standards Council and does not represent the Accused."

32.     . The Judicial Officer (Richard Adams) or his designee was required to meet with the Plaintiff prior to the hearing. Article IV, section 2 (C). The CSC Advisor functioned in the role of the Judicial Officer's designee for this purpose in the Plaintiff's case.

33.     Per the Constitution, the Plaintiff's Advisor informed the Plaintiff that she had a right to legal counsel, but in response to the Plaintiff's question, "Do I need legal counsel?" advised Plaintiff that  legal counsel was not needed in her case since the case did not involve physical

violence, sexual assault or destruction of property. Plaintiff relied on this advice, and did not obtain legal counsel.

34.     On November 3,2021 at 4:30 p.m., Plaintiff met with the student investigator assigned by Caddle, and told the investigator what happened. Plaintiff was not informed by Caddle, Adams, the Advisor, or the investigator that this interview would be the only chance to discuss the incident and provide all evidence. In fact, this interview was labeled as a preliminary investigation to determine if there was enough evidence to hold a hearing. At this time, the Plaintiff did not know the charges against her.

35.     On November 10, 2021, Plaintiff received a text message from her student Advisor informing her that there will be a formal "trial" on November 14, 2021 at 1:00 p.m.

36.     Following that text message, Plaintiff met with her Advisor on November 11, 2021 at 6:00 p.m. where she was told that the "trial" would be November 15, 2021 at 6:00p.m., but she would receive an email at least 48 hours in advance of her "trial" letting her know the accusers' reports and what her alleged violations are. In addition, Plaintiff was told that sanctions of expulsion or suspension were very unlikely for her case.

37.     On November 15, 2021, Plaintiff received an email from Caddle officially notifying her of her charges and that there would be a hearing on November 18, 2021. A copy of the Nov. 15, 2021 letter is attached as **Exhibit 1**.

38.     The Community Standards Council charged Plaintiff with three offenses.

> "Endangering, threatening, or causing physical harm to any person, or causing reasonable apprehension of physical harm."

> "Engaging in intimidation, harassment, coercion, verbal abuse and/or other conduct that threatens or endangers the health or safety of any person."

> "Interfering with the freedom of expression of others —
> Inhibiting the ability of students to comfortably contribute
> and interact with the community."

39.     On November 18, 2021, at the hearing, immediately prior to entering the hearing room, Caddle informed the Plaintiff she would be required to enter a plea, "responsible" or "not responsible", to each charge. The Constitution does not require the Accused to enter a plea. In fact, the Constitution provides: "The Accused shall be considered "Not in Violation" throughout the course of the hearing unless and until he or she has been found "In Violation of the Code by clear and convincing evidence".

40.     The Plaintiff was not told a plea would be required by her Advisor The only hearing process explained to the Plaintiff by her Advisor prior to the hearing was that she would give an opening and closing statement.

41.     When Plaintiff asked for clarification about what the charges meant, Caddle did not explain the charges to Plaintiff. Not understanding the ramifications, Plaintiff plead "responsible" to the first and seconds charges and plead "not responsible" to the third charge.

42.     Caddle barred the Plaintiff from presenting evidence in support of her case.

43.     During the Plaintiff's opening statement and testimony, all the accusers were together in the hall.

44.     Plaintiff was escorted out of the hearing room after she completed her testimony.

45.     The accusers were then brought in the room together to testify.  The Plaintiff was not allowed to be present for the accusers' testimonies, but the accusers were all allowed to hear each other's testimony.

46.     The Constitution provides in Article IV, Section 3(A)(4):"The Accused, and Advisor may be present during the hearing, with the exception of the Council deliberations.

Witnesses other than the Accuser and Accused may be present only during their own testimony. The Accused may observe all evidence presented during the hearing." However, Plaintiff was denied her right to "observe" the evidence presented or to confront her accusers and hear all testimony.

47.     The first witness testified that the proper punishment would be for Plaintiff to be expelled.

48.     After hearing the first witness, the second witness also testified that the proper punishment would be expulsion, even though she previously wrote in her BERS report that she believed proper punishment would be for Plaintiff to formally apologize and attend anti-bias training.

49.     After the accusers' testimony concluded, the Plaintiff was given the opportunity to make a  closing statement.

50.     The Council, after only an hour of deliberation, found Plaintiff responsible of the first and second charges.

51.     At approximately 11:00 p.m., the Council announced to Plaintiff its findings and the sanction of suspension for the Spring 2022 semester, even though Plaintiff had previously been told by her Advisor she would not hear the sanction at the end of the hearing, but would receive a written notification of the Council's decision the day following the hearing.

52.     After delivering this devastating news at 11:00 p.m., Council members left Plaintiff alone in the building, in total disregard for her safety and well-being, no one, not even Plaintiff's student Advisor, offered to remain with her. Plaintiff called her parents and was hysterical and hyperventilating. They remained on the phone for two hours attempting to comfort their daughter, even after the lights in the building were turned off.

53.     Richard Adams, the Director of Community Standards, contacted the Plaintiff by phone on November 19, 2021 to discuss the post-hearing and appeals process. He provided a written summary of that conversation via email to the Plaintiff on the same date. Both the verbal discussion and the written process outlined by Adams stated incorrect appeal procedure. *See* **Exhibit 2** attached hereto and incorporated herein.

54.     The Plaintiff met with Adams and Caddle November 23, 2021 at 9:00 a.m. to receive her formal letter of sanction from the CSC hearing. The Plaintiff received a preliminary letter which was revised due to adjustment for eligibility to return for Summer 2022 instead of the originally worded letter which specified Fall 2022, indicating a suspension longer than the stated Spring 2022 semester.

55.     Adams told the Plaintiff and her parents ,who met with him on November 23, 2021, immediately after the sanction meeting that the information he provided verbally and in writing on November 19 regarding the appeals process was in part wrong.  Additionally, in direct response to the Plaintiff's mother's question as to whether there was an administrative disciplinary route to address the actions of Amaka MgBoh in disseminating and posting the text on social media, Adams stated there was no administrative ability to address this and the Plaintiff would have to report her by filing a complaint about her violation of the Student Code of Conduct. However, the Rhode's Student Handbook states under Adjudication of Student Misconduct "the Director of Community Standards (Adams) may in his or her complete discretion, designate an alleged violation of a student conduct policy to be reviewed administratively.").

56.    Plaintiff received the revised formal outcome letter from Richard Adams on November 26, 2021 (hereinafter, "outcome letter"). The November 26,2021 letter is attached as **Exhibit 3**.

57.    The outcome letter stated different charges than Plaintiff was put on notice of from her original charges by the November 15 letter.  First, the outcome letter stated that she was found "Responsible" for violating "Standards of the Rhodes Community."  In addition, she was found "Responsible" for "Endangering, threatening, or causing physical harm to any person, or unwanted physical contact or causing reasonable apprehension of such harm.  This may include verbal abuse, intimidation, harassment, coercion, and/or other conduct which threatens or endangers the health or safety of any person."  Plaintiff was found "Not Responsible" for Interfering with Freedom of Expression.  The foregoing is in direct violation of Article IV, Section 1, G: "The Accused may be found in violation of the Social Code only for the violation(s) which is the subject of the hearing."

58.    The November 26 letter notified Plaintiff that she could appeal the decision within four business days of the letter.  Plaintiff timely appealed on December 1, 2021.

59.    The Appeals Committee consisted of the Dean of Students, the President of the Honor Council, and the Dean of Faculty and Recruitment, Development, and Diversity (hereinafter collectively, the "Appeals Committee").

60.    The Appeals Committee met on December 13, 2021, during which Plaintiff was permitted to present the evidence she was previously barred from presenting to the Council.

61.    The Community Standards Council Constitution Art. IV, Sec. 5D states that the Appeals Committee can either sustain the decision of the Council or recommend that the Council

reconsider its decision or sanction(s). The Appeals Committee cannot modify, overturn or vacate the Community Standards Council's decision or sanction.

62.     The Appeals Committee found that "the actions of the Council could reasonably be considered in conflict with Section 5.B.1 (the provision that the original hearing was conducted "fairly in light of the charges, and in conformity with prescribed procedures." Therefore, the Appeals Committee recommended that the Community Standards Council reconsider its decision and sanction.

63.     The Community Standards Council reconvened on December 15, 2021, without the presence of Plaintiff, and upheld its previous decision and sanction. This decision is final and there is no appeal under the polices or procedures of Rhodes College.

## REQUEST FOR INJUNCTIVE RELIEF

64.     Plaintiff reasserts and incorporates by reference the allegations set forth in Paragraphs 1 through 63, as though fully set forth herein.

65.     Pursuant to Federal Rule of Civil Procedure 65(b) TEMPORARY RESTRAINING ORDER:

> (1)     *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

> (2) *Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not

to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

(3) *Expediting the Preliminary-Injunction Hearing.* If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

(4) *Motion to Dissolve.* On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

66.     The Sixth Circuit has found that a suspension that occurs after an unfair hearing may constitute an irreparable harm *Roe v. Dir., Miami Univ.*, No. 1:19-cv-136, 2019 U.S. Dist. LEXIS 55246 at *22-23 (S.D. Ohio April 1, 2019. (*See*, Order Granting in Part and Denying in Part, No. 2:19-cv-02336-JTF-tmp, at 10, attached as **Exhibit 4**, for the convenience of the Court.[2] (citing.   Plaintiff's hearing was unfair in that (1) the accuser was not subject to any cross-examination or questioning, (2) the accusers were present to hear each other's testimony and changed their testimony accordingly and (3) the accused did not have an opportunity to testify or introduce exculpatory evidence. "Courts are not prohibited from protecting against procedural irregularities in school disciplinary proceedings that amount to due process violations." *Id*. at 12. Further, the public interest of ensuring that educational institutions comply with procedural due process outweighs the interest of ensuring an educational atmosphere conducive to learning for

---

[2] Order Granting in Part and Denying in Part Plaintiff's Request for a Temporary Restraining Order. No. 2:19-cv-02336-JTF-tmp, John T. Fowlkes, Jr, Judge, June 14, 2019. This Court granted plaintiff's request to enjoin Rhodes from its decision to expel him, which decision was made following a hearing that clearly violated his procedural due process rights.

students. *Id.* For these reasons, this Court should grant injunctive relief to prohibit Defendant Rhodes College from, *inter alia*, suspending the Plaintiff from the 2022 Spring Semester.

67.     Plaintiff will suffer irreparable harm if she is suspended as the result of an unfair trial. This disciplinary action has already damaged Plaintiff's reputation, placed her in a false light, prevented Plaintiff's acceptance in a summer program if injunctive relief is not granted, and will prevent her graduation in four years. Plaintiff is a biochemistry and biomolecular biology major and a number of required courses are only offered during the spring semester.[3] The unavailability of these courses indicates that suspension during the Spring 2022 semester would likely delay Plaintiff's graduation date by an entire year. If her graduation date is delayed, even for  one semester, Plaintiff's ability to begin veterinary school would be postponed, as most programs only accept fall applicants. The disciplinary charge would also appear on Plaintiff's record when applying to veterinary school and any professional licenses necessary to practice as a veterinarian. These educational and career delays only compound the mental anguish that already results from being labeled a racist. *See*, Order Granting in Part and Denying in Part quoting *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018) ("Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life")). Plaintiff's suspension resulting from an unfair proceeding that violated her rights, will cause irreparable injury.

68.     Without the issuance of injunctive relief restraining Rhodes College from implementing the December 16, 2021 final decision of The Community Standards Council *inter alia* suspending Plaintiff from school for the Spring 2022 semester, which starts on January 11, 2022, Plaintiff will suffer immediate and irreparable harm.

---

[3] Genetics BIOL 304, Senior Seminar BMB 485/6, Animal Development BIOL 204, Animal Phys BIOL 340, Parasitology BIOL 302, Molecular and Cellular Neuroscience BIOL 376 are only offered in the spring semester. Virology BIOL 330 is only offered in the fall semester.

## CAUSES OF ACTION

## BREACH OF CONTRACT

69.     The allegations set forth in paragraphs 1-68 are hereby reiterated and incorporated fully by reference.

70.     Plaintiff and Defendant entered into an enforceable contract when Plaintiff began school at Rhodes College.

71.     Defendant breached the contract by failing to provide Plaintiff with procedural requirements outlined in the contract.

Article IV, section 2(B) of the Community Standards Council Constitution provides that:

When notice of the hearing is served, the Accused shall receive a charge letter, including the nature of the alleged violation(s), the name(s) of the individual(s) reporting the alleged violation(s) to the Council, and the time and place of its alleged occurrence.  The Accused shall also receive a written list of hearing procedures as outlined in this article.

Defendant breached the contract by failing to provide a "written list of hearing procedures."  Defendant further breached its contract with Plaintiff by finding her responsible of charges, as indicated in November 26 letter, she was not charged with in the charge letter.

•     Article IV, section 2(D) of the Community Standards Council Constitution provides that:

The Accused shall be allowed to hear all evidence presented in the hearing, but the Accused shall not be present during Council deliberations.  The Accused may offer such proof as is relevant and material to any issue coming before the Community Standards Council for decision in his or her hearing, including, without limitation, the calling of witnesses with relevant knowledge and the questioning of Council witnesses.

15

Defendant breached its contract with Plaintiff by failing to give her a fair opportunity to present evidence at the hearing.  When Plaintiff tried to present documentary evidence to Council, Defendant Caddle informed Plaintiff she would not be permitted to present such evidence.

Article IV, section 3(A)(4) of the Community Standards Council Constitution provides that:

> The Accused, and Advisor may be present during the hearing, with the exception of the Council deliberations.  Witnesses other than the Accuser and Accused may be present only during their own testimony.  The Investigator may be present during both the hearing and deliberations, but the Investigator's participation in deliberations shall be limited to the clarification of facts.  The Accused may observe all evidence presented during the hearing. Disruptive behavior on the part of anyone present shall result in immediate and permanent removal from the hearing.  No other persons may be present during the hearing.

Defendant breached its contract with Plaintiff by failing to sequester the witnesses at the hearing.  Defendant further breach its contract with Plaintiff by denying her the opportunity to hear all evidence against her.  Plaintiff was sequestered from the hearing during witness testimony.

Article IV, section 1(D) of the Community Standards Council Constitution provides that:

> The Accused shall choose an Advisor from the members of the Community Standards Council, excluding the President, the Vice President when serving as President, the two Secretaries, and the Investigator . . . . The Advisor's role is limited to informing the Accused concerning Community Standards Council procedures and answering any questions about those procedures. The Advisor is foremost a member of the Community Standards Council and does not represent the Accused.

72.  Defendant breached its contract with Plaintiff by informing her at an early stage of the proceeding that her Advisor would be an advocate. As a result of Defendant's breach of

the contract, Plaintiff has suffered damages by being suspended school for the 2022 Spring semester.

## RHODES' POLICIES AND PROCEDURES

## VIOLATES THE TENNESSEE HUMAN RIGHTS ACT

73.     Tenn. Code Ann. § 4-21-401(a).  Tennessee law states:

(a)     It is the purpose and intent of the general assembly by this chapter to:

(1)     Provide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972, the Pregnancy Amendment of 1978 (42 U.S.C. § 2000e(k)), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.);

(2)     Assure that Tennessee has appropriate legislation prohibiting discrimination in employment, public accommodations and housing sufficient to justify the deferral of cases by the federal equal employment opportunity commission, the department of housing and urban development, the secretary of labor and the department of justice under those statutes;

(3)     Safeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age or national origin in connection with employment and public accommodations, and because of race, color, creed, religion, sex or national origin in connection with housing;

(4)     Protect their interest in personal dignity and freedom from humiliation;

(5)     Make available to the state their full productive capacity in employment;

(6)     Secure the state against domestic strife and unrest that would menace its democratic institutions;

(7)     Preserve the public safety, health and general welfare; and

(8)     Further the interest, rights, opportunities and privileges of individuals within the state.

Tenn. Code Ann. § 4-21-101.

74.     Defendant Rhodes  is in direct violation of 4-21-101(a) (1),(4) and (8) which are intended to  protect her rights under the Civil Rights acts of 1964, 1968 and 1972 , "protect her interest in personal dignity and freedom from humiliation" and  "further the interests, rights, opportunities and privileges of individuals within the state."

75.     Defendant is inhibiting Plaintiff's interests, rights, opportunities, and privileges by supporting a decision to suspend her for the Spring 2022 semester.

76.     This weighty and consequential decision was made by a student-led group, which violated the procedures set forth in its own constitution, and the members of the Council were not properly trained or supervised by Rhodes College to make such consequential decisions.

77.     Despite the Appeals Committee acknowledging the extraordinary procedural flaws during Plaintiff's trial, the Council upheld its decision to suspend Plaintiff.

78.     By suspending Plaintiff for a semester, regardless of her stellar academic performance, Defendant Rhodes is removing her right to earn a four-year degree and graduate with her class, has caused Plaintiff to lose her scholarship, has caused her emotion pain and suffering, has damaged her reputation, violated her right of privacy by informing her professor of the discipline suspension, although the process was to be confidential.

79.     Defendant MgBoh's text is in direct violation of  T.C.A 4-21-101(a)(4) which is intended to protect individual's "interest in personal dignity and freedom from humiliation." MgBoh's actions constitute cyberbullying, placed Plaintiff in a False Light endangering her by labeling Plaintiff as  a  racist, and harming her reputation.

80.     Defendant MgBoh violated Plaintiff's personal dignity by posting screenshots of private text messages between Plaintiff and her former roommate. Defendant MgBoh, however, failed to post Plaintiff's explanation and apology.

81.     By posting these private texts, MgBoh  invited fellow classmates to criticize, harass, and ostracize Plaintiff and put her in fear and jeopardy of harm.

82.     Defendant MgBoh is employed by Defendant Rhodes as a Resident Advisor, and used her platform to cyberbully another student.

83.     By disseminating partial screenshots of Plaintiff's private text messages, which resulted in the harassment, charges and suspension, Defendant MgBoh violated Plaintiff's personal dignity and right to be free from humiliation.

## NEGLIGENCE COUNT

84.     Defendants owed Plaintiff a duty to advise her of her right to obtain legal counsel. Defendant Adams, through his designee, breached this duty when she recommended to Plaintiff that obtaining legal counsel was unnecessary because it was her opinion the charges against Plaintiff were not serious enough to warrant the involvement of an attorney. Defendant Adams, through his designee, speculated the outcome of the case would be mild punishment, and represented such to Plaintiff. Plaintiff reasonably relied on these statements, did not obtain legal counsel, and suffered grievous injury. Defendant Adams is responsible for the actions of his designee and he failed to properly supervise her.

85.     Defendant Adams owed Plaintiff a duty to be familiar with and accurately describe the role of Plaintiff's advisor throughout the hearing process. It was a breach of such duty for Defendant Caddle to send and Defendant Adams not to correct the statement regarding Plaintiff's advisor that "this individual will serve as your advocate through the process." Community Standards Pre-Hearing Notification email October 13 (sent by Caddle and Adams cc'd). The CSC constitution states that the advisor's role is "limited to informing the accused" about CSC procedures and "does not represent the accused." Article IV, Section 1, C. Plaintiff reasonably

relied on the statement that her advisor was her advocate, as would any reasonable person on a statement from the president of an organization and suffered injury as a result of such reliance.

86.     Defendants Adams and Caddle owed Plaintiff and all members of the Rhodes community a duty to know and uphold the CSC Constitution and procedures. Adams and Caddle consistently breached this duty by allowing a Community Standards Council trial to proceed with as many constitutional and procedural violations as existed here. Certainly, as the Director and President of Community Standards, Adams and Caddle should have the utmost understanding of the CSC constitution and procedures and be competent to conduct a trial aligning with the Constitution. Plaintiff reasonably relied on the belief that procedures would be properly followed, and suffered grievous injury as a result thereof.

## GROSS NEGLIGENCE

87.     Defendants Adam and Caddle owed Plaintiff and all members of the Rhodes community a duty to know and uphold the CSC constitution and procedures. Adams and Caddle consistently breached this duty by allowing a Community Standards Council trial to proceed with as many constitutional and procedural violations as existed here. Throughout this trial and appeal process, Adams and Caddle acted with such reckless disregard for Plaintiff's rights that a conscious indifference to her resulting suspension can be implied.

## PROMISSORY FRAUD

88.     Defendant Caddle made a promise as to a material matter by informing Plaintiff her advisor was to serve as her advocate throughout the trial process. Caddle did not intend to provide Plaintiff with an advocate when he made this statement. Plaintiff acted in reliance upon this statement, which she did by entrusting her advisor and not obtaining a legal advocate. Plaintiff was

20

unaware that Defendant did not intend to provide an advocate or that her advisor was not her advocate. Plaintiff was justified in relying upon this promise, and as a result of such reliance, has sustained significant injury.

## NEGLIGENT TRAINING AND SUPERVISION

89.     Rhodes College has a duty to ensure that its employees, Adams, MgBoh and representatives, Caddle and members of the CSC, are properly trained and supervised. The director and members of the CSC hold an enormous amount of power and influence over the Rhodes community and as such Rhodes has a duty to properly train and supervise these members. They breached this duty by neither properly training nor supervising the Community Standards Committee, specifically Director Adams and President Caddle. Rhodes allowed an entire trial, appeal, and suspension to occur without proper training or supervision and Plaintiff was grievously injured by this breach. Rhodes improperly delegated the decision to suspend or expel a student to a student body council.

## FRAUDULENT MISREPRESENTATION

90.     Defendant Caddle has a duty to ensure adequate communication among the CSC and the Appeals Committee throughout the trial process. Caddle stated that, at the hearing, he read the charges and explained to Plaintiff *twice* if she does not feel responsible for a charge she should plead "Not Guilty." Not once during the hearing did Caddle explain this to Plaintiff. Caddle also told the Appeals Committee that he gave Plaintiff notice that she was supposed to present evidence in advance of the hearing so the Committee could read through it, but no such notification was given. Thus, Plaintiff believed she could submit evidence at the hearing but was barred from doing so. However, Caddle breached this duty by recklessly making false statements of fact regarding

the CSC constitution and his recollection of the trial to the CSC and the Appeals Committee. Unfamiliar with the CSC constitution, Plaintiff reasonably relied on these misrepresentations and suffered injury as a result.

## **FALSE LIGHT**

91.     Defendants MgBoh and Rhodes, vicariously as her employer, placed Plaintiff in a false light. MgBoh posted partial, misleading screenshots and her own commentary on social media. These posts are highly offensive to a reasonable person because they do not include Plaintiff's explanation and apology for the previous message. Defendant MgBoh posted these screenshots attacking Plaintiff in total disregard for any offense they might cause. Rhodes can be held responsible for these actions of its employee, resident advisor MgBoh.

## **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

92.     Defendants MgBoh, Rhodes, and Adams, caused Plaintiff severe mental anguish as a result of their reckless acts identified herein. These acts are certainly more than trivial threats as they resulted in Plaintiff's suspension.

## **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

93.     Defendants Caddle and Rhodes caused Plaintiff severe mental anguish as a result of abandoning her following the devastating news of her suspension. Defendants Caddle and Rhodes had a duty to ensure Plaintiff's safety and breached this by leaving her alone in a school building with the lights off at 11:00 p.m. Plaintiff, already hysterical from the news she just received, was left alone by the CSC and her advisor in complete disregard for her safety and well-being.

22

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff request that:

1.      Proper process issue and be served upon Defendants Rhodes College, David

Caddle, Amaka MgBoh, and Richard Adams.

2.      This Court allow Plaintiff to proceed under pseudonym in this matter;

3.      Upon application and after hearing, this Court issue a temporary restraining

order/and or preliminary injunction restraining Rhodes College from:

   a.  Suspending Plaintiff during the Spring 2022 semester, eligible to re-enroll
       Summer 2022.

   b.  Imposing the requirement to complete a Self-Designed Course of Study:
       identifying a minimum of 5 educational resources (books, movies, videos,
       articles) that you can use for self-study and they should be submitted to the
       Director of Community Standards for final approval. Once approved, you will
       be expected to study the resources and incorporate the learning in your
       reflection essay.

   c.  Submitting a 5-page essay that addresses the following: Lifelong learning,
       compassion for others, leadership and action in our community,
       honor, and a commitment to diversity are central tenets of the Rhodes vision.

4.      That after hearing, this Honorable Court award Plaintiffs the following:

   a.  Their attorneys' fees pursuant to Tennessee Code Annotated Section 4-21-306
       and 311; and

   b.  Compensatory damages for future pecuniary losses, emotional pain, suffering,
       inconvenience, mental anguish, loss of enjoyment of life, and other
       nonpecuniary losses, in the amount of $300,000.00.

5.      For other such relief that the Plaintiffs may be granted, both legal and equitable as they may be entitled under the facts and law.

Respectfully submitted,

APPERSON CRUMP PLC

_____
Bruce S. Kramer (#7472)
Jacob Webster Brown (# 36404)
6000 Poplar Avenue, Suite 150
Memphis, Tennessee 38119
Phone: (901) 756-6300
bkramer@appersoncrump.com
jbrown@appersoncrump.com

## **VERIFICATION**

Commonwealth of Virginia    )

County of Albemarle          )


I, the undersigned, having been duly sworn, make oath that the facts and allegations set
forth in the VERIFIED COMPLAINT are true and accurate to the best of my knowledge and belief.



_____
Plaintiff

Sworn and subscribed before me this 28th day of December, 2021.


Jason McCants Barnel
Notary Public

My Commission Expires:

3/31/2025

25