**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS**

JANE DOE,

      Plaintiff,

v.                                                    No. 2:21-cv-02811-JTF-tmp

RHODES COLLEGE,
DAVID CADDLE, AMAKA MGBOH,
AND RICHARD ADAMS,

      Defendants.

**RESPONSE OF RHODES COLLEGE IN OPPOSITION TO PLAINTIFF'S**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR**
**MOTION FOR A PRELIMINARY INJUNCTION**

      Defendants Rhodes College ("Rhodes"), by and through undersigned counsel, submits this its Response in Opposition to Plaintiff Jane Doe's Motion for Temporary Restraining Order and/or for a Preliminary Injunction. Plaintiff Jane Doe[1] seeks a temporary restraining order and/or preliminary injunction restraining Rhodes College from enforcing a semester-long suspension, a self-designated course of study, and a 5-page reflective essay—collective discipline imposed after Plaintiff was found in violation of the Rhodes student code of conduct for sending a racially-charged text message to a classmate. Plaintiff submitted her request in her Complaint, which the Court has set for a hearing on January 31, 2022. (ECF No. 14). Plaintiff has not filed a separate motion requesting injunctive relief.

---

[1] Plaintiff has applied to this Court to proceed under a pseudonym, which Rhodes strongly opposes. (*See* ECF Nos. 8, 15). Because that Motion remains pending, Rhodes refers to Plaintiff as either Plaintiff or Jane Doe throughout this pleading.

Plaintiff's request for injunctive relief should be denied because she has failed to make the extraordinary showing required to obtain such relief.  In particular, Plaintiff has not shown a substantial likelihood that she will prevail on the merits of her claims.  Plaintiff has similarly failed to demonstrate that she will suffer irreparable injury in the absence of injunctive relief.  The failure to satisfy either of these factors is fatal to her request.  The remaining factors further militate against injunctive relief, as well.  Thus, there is no basis for the Court to grant the injunctive relief she seeks.

## BACKGROUND FACTS

This case involves a straightforward violation of the Rhodes College Student Code of Conduct, resulting in the discipline of Plaintiff.  In the early morning hours of Sunday, October 3, 2021, a Rhodes College student was tragically shot and killed in his off-campus home during a home invasion.  On Sunday evening, Rhodes issued an alert through Campus Safety, informing all students that a suspect had been identified as "Rainess Holmes, Age 36, Height 6'2', Weight 165, Race Black" and believed to be "on foot or in a small green Jeep SUV."  (Ex. A, Case Packet, at p. 10).[2]  Plaintiff, who is white, claims that after reading this description, she feared for the safety of a Black former roommate who lived off campus and sent her this text:  "Imma be racist: If you see a black man in the next 24 hrs near your house hit him with your car."  (Compl. ¶ 15, ECF No. 1 at PageID 3-4).

The recipient of her text message took a screenshot and shared it with a close Black friend, Defendant Amaka MgBoh ("Ms. MgBoh"), who is also a Rhodes student. (Compl. ¶ 16, ECF No. 1 at PageID 4).  Ms. MgBoh and the recipient exchanged texts about Plaintiff's text, with the

---

[2] Rhodes has redacted from its Exhibits any identifying information of Plaintiff or other Rhodes students that are non-parties to this litigation.  Rhodes can make available, upon request of the Court, unredacted versions of its Exhibits.

recipient texting, "I just don't even know what to say.  [I']m not even gonna respond im just so exhausted like why the fuck would u tell that to someone."  (Ex. B).

Ms. MgBoh immediately posted the message from Plaintiff to Snapchat.  She will testify at the hearing that she was motivated to do so by the fear of a backlash against Black students by white students because the person who committed the murder was Black. Ms. MgBoh also responded to Plaintiff, texting back: "You racist af [as fuck] for what you texted brit.  Fuck you". Plaintiff responded to Ms. MgBoh:

> There is a man breaking into student homes right now and people we know were shot and killed.  She lives alone with 3 other girls does that not scare you to think they could be next?  They have almost no protection on their house and he is at large.  So yes if she sees someone suspicious on her street that matches the description I think she should report it.  Not literally hit him with her car.  Do you not feel the same way?  I'd tell her the same thing if it was a white man or a woman or anyone else.

(Ex. C).

Approximately seven minutes later, having received no response from either the original recipient or Ms. MgBoh, Plaintiff wrote:  "But yes, they [sic] way I phrased what I said was racist and I should have thought more before I sent it.  I am sorry as I try to be more respectful and understanding in how I view others but that was not the case here."  (Compl. ¶ 18, ECF No. 1 at PageID 4).  That same night, Plaintiff sent another text to the recipient, but not to Ms. MgBoh, apologizing again but again trying to justify what she said:  "What I said was wrong and I could have said it better but im scared for you right now. And in Campos [sic] email they said there might be a group of people helping the suspect." (Compl. ¶ 19, ECF No. 1 at PageID 4).

Stunned that Plaintiff was trying to explain away the hurtful text, Ms. MgBoh uploaded the screenshots of the entire exchange between her and Plaintiff, including the last comment from Plaintiff acknowledging that her text was racist, to her Snapchat story.  Other Rhodes students who

saw the posts on social media were highly critical of Plaintiff, accusing her of racial profiling. (Compl. ⁋ 25, ECF No. 1, PageID 5).  Plaintiff responded to one such accusation by admitting that she was wrong and declaring that she would "except [sic] the punishment that come [sic] from my actions." (Compl. ⁋ 26, PageID 5).  Three Black students filed bias reports concerning the text on Rhodes' Bias Education Reporting System ("BERS").  (*See* Ex. A).

Realizing that her justifications for the text were not being accepted, Plaintiff posted an apology on Instagram on October 5, 2021, stating, among other things, that she was sorry for her "blatant display of racism," that her actions were "wrong and disrespectful to the black community of Rhodes," and that she would "educate herself to provide support rather than harm." (Compl. ⁋ 27, ECF No. 1 at PageID 5).

The BERS reports were directed to Defendant Richard Adams, Director of Community Standards, for handling as a possible violation of the student conduct standards in Rhodes' Student Handbook.  Mr. Adams determined that this matter was within the jurisdiction of the Community Standards Council ("CSC"), a student-run (and student-elected) adjudicatory body for violations of Rhodes' Standards of Conduct, to investigate and determine if charges should be brought. Defendant David Caddle ("Mr. Caddle") is the student President of the CSC and, on October 13, 2021, he informed Plaintiff of the investigation.  (Compl. ⁋ 30, ECF No. 1 at PageID 6).

Pursuant to the CSC Constitution, Plaintiff was offered a list of CSC members who could serve as a student advisor to her during the process, and she selected Madison Bagsby ("Ms. Bagsby").  It was Ms. Bagsby's role to assist Plaintiff with understanding the CSC process, and they met several times in advance of the hearing.  The CSC Constitution and its processes are also publicly available on the Rhodes College website, as part of its Student Handbook.  The CSC Constitution clearly states that "[t]he Advisor's role is limited to informing the Accused

concerning Community Standards Council procedures and answering any questions about those procedures.  The Advisor is foremost a member of the Community Standards Council and does not represent the Accused." Art. IV, Section 1.D, https://handbook.rhodes.edu/student-handbook/community-standards-council-onstitution/article-iv-judicial-procedures.

On November 15, 2021, as required by the Constitution (at least forty-eight hours prior to the hearing), Mr. Caddle sent Plaintiff an email notifying her in writing of three charges that the CSC would consider in a formal hearing based on her "incident of bias against members of the Rhodes Community": (1) Endangering, threatening, or causing physical harm to any person, or causing reasonable apprehension of physical harm; (2) Engaging in intimidation, harassment, coercion, verbal abuse and/or other conduct that threatens or endangers the health or safety of any person; and (3) Interfering with the freedom of expression of others – Inhibiting the ability of students to comfortably contribute and interact with the community.  The email contained a link to the conduct process and a copy of the Case Packet, which contained detailed information on the BERS reports, including who filed them.  (Compl. Ex. 1, ECF No. 1-3).[3]

The disciplinary hearing occurred on November 18, 2021.  Plaintiff made a statement at the beginning of the hearing, wherein she admitted to having sent the text message, apologized, explained what she considered to be her innocent intent in sending the text message, and expounded upon her time spent in anti-bias training..  The three accusers, the students who filed BERS reports, testified to the effect of Plaintiff's message on them and the Rhodes Community, particularly as to students of color.  After testimony, Plaintiff gave closing remarks and the CSC began deliberations.  Plaintiff was found in violation of two of the three charges, with the formal

---

[3] Plaintiff inexplicable contends that this letter did not contain all of the charges of which she was found in violation, which is simply not correct.  She also contends that she was not provided a copy of the CSC hearing procedures, when the email contains a link to those procedures.

Outcome Decision to follow.  A recording of the hearing was made and is in the process of being transcribed by a certified court reporter.

Ms. Bagsby will testify at the hearing on this matter that she met four times with Plaintiff prior to the hearing, including one Zoom meeting with Plaintiff's parents, and that she answered or found the answer to all of Plaintiff's questions.  During the hearing, Ms. Bagsby sat with Plaintiff during times when she was not permitted in the hearing room and was with her when the decision was announced.  Ms. Bagsby was not present for and did not participate in deliberations. Ms. Bagsby will testify that she stayed with Plaintiff for a significant amount of time after the hearing, during which time she was on the phone with her parents, and left only after Plaintiff gave her permission to go while still talking with her parents on the phone.

After the disciplinary hearing, Plaintiff followed up with Mr. Adams on her options. He gave Plaintiff detailed instructions on how to file a rebuttal to the CSC to the outcome decision and how to submit an appeal to the Dean of Students.  (Compl., Ex. 2, ECF No. 1-4).  Thereafter, Mr. Adams issued the Outcome Decision, explaining the following:

> According to [Jane Doe's] admission, she admitted to sending the message to her friend.  Although [Jane Doe] issued an apology on her social media account as well as attended the anti-black bias forum and did personal research on the impact of her actions, her actions have compromised the sense of safety and belonging for the students on campus and within the greater Memphis community.  In addition, the concern for safety has compounded and impacted the campus community, particularly for the students of color on campus.  [Jane Doe's] actions directly violate the Standards of the Rhodes community (including the Commitment to Diversity) with regard to discrimination and failing to respect fellow students on campus.  Furthermore, the student's actions aided in creating an environment where the students of color felt threatened/harassed.  [Jane Doe] shared that she is willing to learn, grow, and apologize to the students affected and, the Rhodes community.

(Compl., Ex. 3, ECF No. 1-5).  Plaintiff was provided a copy of the Outcome Decision, which also notified her that she had been found responsible for two of the three charges[4] and received a one-semester suspension, in addition to being required to complete a self-designated course of study and 5-page reflection essay.  The recording of the hearing was also made available to Plaintiff so that she could use it to consider her appeal options.

Plaintiff, as was her right, appealed the CSC decision in writing to the Rhodes College Dean of Students, Alicia Golston.  (Exs. D, E). Per the CSC Constitution, the appeal was considered by a 3-member Appeals Committee.  That committee, composed of Dean Golston; Meg Corley, the student President of the Honor Council; and Justin Rose, Dean for Faculty Recruitment, Development, and Diversity, after a hearing, returned the decision to the CSC for reconsideration, in light of the procedural issues raised by Plaintiff, which are the same issues raised in the instant litigation.  Plaintiff was provided an opportunity to submit any additional information she wished to the CSC prior to the reconsideration hearing. Upon reconsideration, the CSC upheld its prior decision, recognizing that, ultimately, the action that violated the Rhodes Code of Conduct was the language of the initial text message.  (See Reconsideration Outcome Letter, attached as Exhibit F).  The Reconsideration Outcome Letter expressly recognized that the CSC considered "the evidence you had intended to introduce at the CSC hearing, and the information submitted at the appeal review hearing."  (Ex. F at p. 1).

The process worked—the Appeals Committee recognized that there may have been procedural irregularities and instructed the CSC to consider new evidence submitted by Plaintiff. The CSC did so.  Both the CSC and the Appeals Committee confirmed that, by clear and convincing evidence, Plaintiff's message was a violation of Rhodes' Standards of Conduct.

---

[4] Plaintiff was found "not responsible" for the charge of Interfering with Freedom of Expression.

Plaintiff argued before the hearing panel, and again on appeal and reconsideration, that she was motivated to send the text solely by her desire to protect her friend from the at-large perpetrator of the crime and that she used the phrase "hit him with your car" in a joking manner, not intending it to be taken literally.  The CSC considered and rejected this position in its outcome determination, noting that "the language you chose cannot reasonably be read to convey that intention, since it merely advises her to hit the next Black man she sees with her car.  Nor can there be any question that such advice would be perceived as threatening to a Black person."  (Ex. F at p. 2).  Plaintiff also sought to blame the harm created by her text on others who forwarded it and commented on it on social media. The CSC considered and rejected this position as well, noting that it was she who "in fact, created the message."

Rather than accept the punishment that comes from her actions, as she promised to do in her text, Plaintiff has filed a meritless federal lawsuit against Rhodes College and three African-American individuals—(1) Ms. MgBoh, who, after receiving a screenshot of the text message from its original recipient, shared it on social media, (2) Mr. Caddle, the student President of the Community Standards Council, and (3) Mr. Adams, the Director of Community Standards.  (See Compl. ¶¶ 21, 5, 7, ECF No. 1 at PageID 4, 2).  Not only does Plaintiff ask this Court to engage in the extraordinary remedy of enjoining Rhodes' from adjudicating and enforcing its own student conduct rules, but also seeks relief from the Court from any consequences for her actions, including writing a five-page reflection essay or completing a self-designated course of study.  Ultimately, she seeks $300,000.00 in damages and her attorney's fees.  (Compl., ECF No. 1 at PageID 23 ("Request for Relief")).

As a basis for the requested relief, Plaintiff alleges a barrage of state-law claims against the Defendants, to wit: (1) breach of contract, based on an argument that the CSC did not follow its

own Constitution; (2) the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-401(a), based on a purported right to "earn a four-year degree and graduate with her class" and based on her humiliation at being labeled as racist; (3) Negligence; (4) Gross Negligence; (5) Promissory Fraud; (6) Negligent Training and Supervision; (7) Fraudulent Misrepresentation; (8) False Light; (9) Intentional Infliction of Emotional Distress; and (10) Negligent Infliction of Emotional Distress.

In order to avoid a rushed hearing with insufficient time to prepare, the parties have agreed that any suspension Plaintiff must serve will occur in the Fall Semester of 2022, pending the outcome of this hearing.

## <u>STANDARD OF REVIEW</u>

A "preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Doe v. Ohio St. Univ.*, 136 F. Supp. 3d 854, 862 (S.D. Ohio Jan. 22, 2016) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)) (internal quotation marks omitted). It is "one of the most drastic tools in the arsenal of judicial remedies." *Doe v. Transylvania Univ.*, 2020 WL 1860696, at *5 (E.D. Ky. Apr. 13, 2020) (quoting *Am. Civ. Liberties Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 444 (6th Cir. 2003)). The purpose is to "preserve the relative positions of the parties until a trial on the merits can be held." *Id.* (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). The test for whether injunctive relief is warranted has four factors: (1) whether the plaintiff has shown a strong likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm in the absence of injunctive relief; (3) whether injunctive relief will cause substantial harm to the defendant or others; and (4) whether the public interest would be served by injunctive relief. *See Doe v. Ohio St. Univ.*, 2016 WL 692547, at *5

(S.D. Ohio Feb. 22, 2016) (Rep. & Rec.), (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007)), *adopted*, 2016 WL 1578750 (S.D. Ohio Apr. 20, 2016).

A plaintiff "must establish[ ] a substantial likelihood or probability of success on the merits." *Doe*, 136 F. Supp. 3d at 862 (quoting *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010)). And "irreparable injury is generally required to warrant injunctive relief." *Id.* at *5 (citing *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 866 (S.D. Ohio 2008)) (internal quotation marks omitted). Finally, "if the injury . . . is compensable by a monetary damages award, there is usually no basis upon which to grant any type of injunction, no matter how strong a showing of likelihood of success on the merits is made." *Id.*

## ARGUMENT

### I.     Plaintiff Has Not Shown a Substantial Likelihood of Success on the Merits.

In her Complaint, Plaintiff includes a "Request for Injunctive Relief." (ECF No. 1, ¶¶ 65-68, at PageID 12-14). Plaintiff does not specify on which cause of action she bases her request for injunctive relief, the existence of which is necessary to seek such relief. *See, e.g. KM Organic Fund, Inc. v. Smithson*, 2020 WL 7178929 (M.D. Tenn. Dec. 7, 2020) (injunctive relief is a remedy dependent on an underlying cause of action). Plaintiff argues in the Complaint that "a suspension that occurs after an unfair hearing may constitute an irreparable harm," (Compl. ⁋ 66), citing *Roe v. Director, Miami Univ.*, 2019 WL 1439585 (S.D. Ohio Apr. 1, 2019). In that case, the plaintiff, accused of sexual assault, sought injunctive relief to preemptively prevent his participation in a Title IX sexual misconduct hearing, arguing that it could be used against him in a concurrent criminal proceeding. *Id.* at *3-8. The Court denied the motion for injunctive relief, holding that Plaintiff had not established the element of irreparable harm and that Plaintiff had not met the "heavy burden" of demonstrating his entitlement to a preliminary injunction. *Id.* at *3, 8-9 (noting that Plaintiff was unlikely to success on the merits of his claim).

Plaintiff goes on to list the reasons she claims her hearing was unfair:

1. The accuser was not subject to any cross-examination or questioning;

2. The accusers were present to hear each other's testimony and changed their testimony accordingly;

3. The accused did not have an opportunity to testify or introduce exculpatory evidence.

(Compl. ⁋ 66, ECF No. 1 at PageID 13).  To the extent that Plaintiff seeks to argue that her Constitutional right to due process was violated, her lawsuit alleges no constitutional claim and the defendants are a private college and three private individuals, not state actors.  Due process standards apply only when a state institution is involved.  *See, e.g. Doe v. Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) ("**State** universities must afford students minimum due process protections before issuing significant disciplinary decisions" (citing *Claim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005))) (emphasis added).  Nor does her lawsuit allege a violation of Title IX, which also mandates specific procedural safeguards.  *See* 34 C.F.R. § 106.1, *et seq.* [5]

Rather, her claim based on the above alleged procedural irregularities rests on one for breach of contract based on the CSC Constitution, which is the type of educational policy for which the Sixth Circuit has recognized an implied contract between the educational institution and the student.  In *Doherty v. Southern College of Optometry*¸ 862 F.2d 570, 577 (6th Cir. 1988), the court recognized that "the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area."  The implied contractual relationship is defined by "catalogs, manuals, student handbooks, bulletins, circulars and regulations of a

---

[5] This Court has recognized the distinction between Title IX and breach of contract claims previously in *John Doe v. Rhodes College*.  (See Ex. 4 to Pl.'s Compl, ECF No. 1-6, n.4 ("These cases are distinguishable, however, from present circumstances because . . . Plaintiff's claim here, regardless of cross-examination, invokes due process concerns under **Title IX**, not a breach of contract theory.")) (emphasis added).

university." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 689 (M.D. Tenn. 2018) (citing *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005)).   The provisions of such documents "have unique qualities and must be construed to allow the [college's] governing body to meet its educational and doctrinal responsibilities . . . it is not the role of the Court to 'advocate for best practices.'"   *Id.* (quoting *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011); *Yu v. Vassar College*, 97 F. Supp. 3d 448, 561 (S.D.N.Y. 2015)) (internal marks omitted).   In evaluating a breach of contract claim based on an implied contract, courts have looked to "whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules, an objective reasonableness standard."   *Doe v. Transylvania Univ.*, 2020 WL 1860696, at *9 (quoting *Faparusi v. Case W. Reserve Univ.*, 711 F. App'x 269, 277 (6th Cir. 2017)).

Thus, any rights Plaintiff had in the hearing must be found in the CSC Constitution, not the U.S. Constitution.   The CSC Constitution does provide that "[t]he accused shall be allowed to hear all evidence presented at the hearing" and to "offer such proof as is relevant and material to any issue coming before the [CSC] for decision in his or her hearing, including, without limitation, the calling of witnesses with relevant knowledge and the questioning of Council witnesses." In the hearing, Plaintiff was allowed to present proof through her opening and closing statements.   She was not, however, allowed to introduce evidence or hear the testimony of the three accusers and to ask them questions.   That is why, on appeal, the case was sent back to the CSC to cure these irregularities.   Plaintiff was provided with a recording of the hearing and could therefore hear the testimony of the three accusers, which was limited to the effect the text had on them and other students of color.[6]   She was also permitted to submit all the evidence she intended to submit at the

---

[6] Plaintiff claims that the three accusers should not have been permitted to hear each other's testimony, but this is not required by the CSC Constitution, which provides only that "[w]itnesses

hearing, her submissions to the Appeals Committee, and to offer any other arguments or evidence she wished to offer to the CSC in its reconsideration of her case.

A college may be liable for breach of contract relating to a student disciplinary hearing in the educational context only if the college has somehow "abused its discretion" by acting "unreasonably, arbitrarily, or unconscionably." *Valente v. University of Dayton*, 438 F. App'x 381, 385 (6th Cir. 2011) (applying the abuse-of-discretion standard to breach of contract claim against a law school based on its honor code and explaining that "[c]ontrary to Valenti's assertions, the issue is *not* whether the Law School strictly adhered to each of the Honor Code's procedural rules, or whether it could have provided a better hearing"); *Anderson v. Vanderbilt Univ*., 2010 WL 2196599, at *13 (M.D. Tenn. May 27, 2010) (the inquiry is whether the college "substantially complied with its own rules"), *aff'd*, 450 F. App'x 500 (6th Cir. 2011); *Kimberg v. University of Scranton*, 2007 WL 405971 at *5 (M.D. Pa. Feb. 2, 2007) (using substantial compliance standard in contract claim based on private university disciplinary proceeding); *Bhandari v. Trustees of Columbia University*, 2000 WL 310344 at **6-7 (S.D. N.Y. March 27, 2000) (applying abuse of discretion standard to contract claim based on private university disciplinary proceeding).

In the present case, it is beyond dispute that Rhodes substantially complied with the CSC Constitution and did not abuse its discretion in finding Plaintiff in violation of its student conduct rules. This was not a case in which Plaintiff disputed the factual allegations against her. She admitted to sending the text and admitted several times that it could be considered racist, as her accusers claimed. She also admitted, in her Instagram apology, to the harm the text had caused the Rhodes Community. To the extent she was not permitted to introduce evidence explaining

---

other than the accuser and accused may be present only during their own testimony." There were no witnesses at the hearing other than the accused and her three accusers.

what she considered to be her benign intentions in sending the text, or to argue that the real culprit was Ms. MgBoh for forwarding the text in the first place,[7] those defects were cured on appeal and reconsideration.  Plaintiff does not plead that the CSC failed to consider the directions of the Appeals Committee or failed to consider the additional evidence she submitted on reconsideration. In the absence of such a defect in or material deviation from the administrative appellate procedure prescribed by the CSC Constitution, Plaintiff is unlikely to succeed on the merits of her breach of contract claim.

Plaintiff asserts a number of other claims without specifying if they form the basis of her claim for injunctive relief, but even if they were considered, Plaintiff cannot show a reasonable likelihood of success on the merits.  Each claim is address in turn below.

a.  *Tennessee Human Rights Act ("THRA")*

The most puzzling of Plaintiff's ten claims may be that under the THRA.  Plaintiff cites, as the basis for her THRA claim, only to the "purpose" section of the statute, Tenn. Code Ann. § 4-21-101(a), alleging that Rhodes has violated the purpose of the THRA by suspending Plaintiff.[8]  Plaintiff also makes a general statement that the THRA is intended to "protect her rights under the Civil Rights acts of 1964, 1968 and 1972."  (Compl., ECF No. 1 at ¶ 74, PageID 18). Yet, Plaintiff fails to identify what those rights are, as Plaintiff makes no claim that she was subject to discrimination or retaliation on account of her status in a protected class, such that she has a claim under the policies embodied in the federal civil rights statutes.  *See, e.g. Harper v. BP Exploration & Oil Co.¸*896 F. Supp. 743, 747 (M.D. Tenn. Aug. 23, 1995) (the THRA addresses

---

[7] It should be noted that Plaintiff has at no point blamed the recipient for the fact that her text became public, even though it was she, not Ms. MgBoh, who originally forwarded the text.
[8] Plaintiff also argues that Defendant MgBoh violated the THRA by posting screenshots of her text message, despite controlling case law that there is no individual liability under the THRA. *See, e.g. Bowles v. Heath Consultants, Inc.*, 2017 WL 1026017, at *2 (W.D. Tenn. Mar. 16, 2017).

discrimination in the same fashion as claims under the Civil Rights Acts); *see also Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 26 (Tenn. 2014) (summarizing that the THRA provides for execution of discrimination claims that are coextensive with the federal Civil Rights Act of 1964, 1968 and 1972, in addition to the Age Discrimination in Employment Act of 1967). This claim is wholly baseless, absent any allegation that Plaintiff was subject to an unlawful discriminatory practice. To the extent Plaintiff claims discrimination based on her ADHD diagnosis, "there is no separate claim of disability discrimination under the THRA." *Whited v. Cmty Bank of the Cumberlands, Inc.*, 2010 WL 605280, at *8 (M.D. Tenn. Feb. 18, 2010).

> b. *Tort Claims – Negligence, Gross Negligence, Negligent Training and Supervision, False Light, IIED, NIED*

Plaintiff alleges a scattershot of allegations in tort against the Defendants in this action, some aimed at Rhodes, some not. But by Plaintiff's own allegations, each of these claims is for damages based on alleged breaches that have already occurred, not any prospective action. Consequently, these are not appropriate bases for injunctive relief. *See, e.g. Doe v. Ohio State Univ.*, 2016 WL 692547, at *5 ("[I]f the injury which the plaintiff seeks to prevent is compensable by a monetary damages award, there is usually no basis upon which to grant any type of injunction.").

Regardless, the allegations lack merit. The negligence claims are based on the same alleged procedural issues as her breach of contract claim, and it is well-settled that a tort exists only if a party breaches a duty independent of one which he owes under a contract. *Calipari v. Powertel, Inc.*, 231 F. Supp.2d 734, 736 (W.D. Tenn. Nov. 19, 2002). The most bizarre allegations, listed under the negligence and promissory fraud counts, relate to the incorrect statement in Mr. Caddle's October 13, 2021 letter to Plaintiff referring to her student advisor as her "advocate" through the process (Compl. ¶¶ 85, 88, ECF No. 1 at PageID 19-20), and the related allegation that Mr. Adams

had a duty to advise her that she had a right to legal counsel for the hearing. (Compl. ₧ 84, ECF No. 1 at PageID 19). As the Complaint correctly notes, the CSC Constitution specifically states that the advisor is not an advocate, and the Complaint nowhere alleges that Plaintiff was somehow disadvantaged by this poor choice of word. Mr. Adams did not advise Plaintiff of her right to legal counsel because she does not have one for CSC proceedings. The CSC Constitution states: "Legal counsel retained by an Accused Student or any other person participating in the hearing shall not attend any hearing of the [CSC]. Any advice or assistance requested of legal counsel by a student must be obtained prior to the hearing." Surely Plaintiff is not making the specious argument that Plaintiff did not retain legal counsel because she thought her student advisor was her "advocate."[9]

Plaintiff's claims for false light invasion of privacy, IIED and NIED must also fail as a matter of law. Plaintiff herself described her conduct as racist, so there can be no claim for false light invasion of privacy. *Loftis v. Rayborn*, 2018 WL 1895842, at *7 (Tenn. Ct. App. Apr. 20, 2018) (only "seriously offensive **mis**statements" are actionable under a false light theory) (emphasis added). Nor does any of the conduct alleged against any defendant meet the high threshold required to plead an IIED or NIED claim: conduct that is so extreme that it would not be tolerated in a civilized society. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012) (describing a requirement that conduct be so "outrageous, not to be tolerated in civilized society" for an IIED or NIED claim).

---

[9] To the extent Plaintiff is alleging the negligence and promissory fraud claims against Mr. Caddle individually, Rhodes is the party against which injunctive relief is sought, and, thus, these claims are not an appropriate basis for injunctive relief.

II.    **Plaintiff Fails to Show that She Will Suffer Irreparable Injury Absent Injunctive Relief.**

Because Plaintiff has not demonstrated her likelihood of success on the merits, the Court may deny her request for injunctive relief on that ground alone. *See, e.g. Doe*, 136 F. Supp. 3d at 862 (noting that a plaintiff "must establish[] a substantial likelihood or probability of success on the merits") (quoting *Int'l Dairy Foods Ass'n*, 622 F.3d at 635). Even if this Court finds that Plaintiff meets her burden that she is substantially likely to succeed against Rhodes, however, Plaintiff must also establish an irreparable injury. *Doe v. Ohio State Univ.*, 2016 WL 692547, at *5 (citing *Kendall Holdings, Ltd.*, 630 F. Supp. 2d at 866) (internal marks omitted).

As "irreparable harm," Plaintiff argues that, as a result of her one-semester suspension, she could suffer damage to her reputation, miss out on attending a summer program abroad, experience a delay in graduation, and be required to apply to veterinary school with the discipline on her record. (Compl. ¶ 67, ECF No. 1 at PageID 14). A one-semester suspension, after which Plaintiff will have the opportunity to re-enroll at Rhodes and proceed in good standing, is insufficient to establish irreparable harm. *See Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio Oct. 19, 2015) (citing *Medlock v. Trs. of Ind. Univ.*, 2011 WL 4068453, at *9 (S.D. Ind. Sept. 13, 2011)). Finally, Plaintiff cites to no harm resulting from the remaining discipline imposed by the CSC—which required her to submit a five-page reflective essay and participate in a Self-Designated Course of Study. Thus, there is no basis to enjoin this discipline either.

Nor do the Title IX cases cited by Plaintiff avail her. Both this Court's prior matter, *John Doe v. Rhodes* (attached as Exhibit 4 to the Complaint), and *Roe v. Director, Miami Univ.*, 2019 WL 1439585 (S.D. Ohio Apr. 1, 2019), involved discipline based on disputed allegations of sexual misconduct, in which cases the courts rightly observed that "[b]eing labeled a sex offender by a university has both an immediate and lasting impact on a student's life." (ECF 1-6 at PageID 51

(recognizing same)).   The reputation Plaintiff may garner from a text message she admits to sending is not the sort of harm contemplated in those lines of cases.

While the Court need not consider this factor absent a finding of likelihood of success, the alleged injury here is not irreparable.  Plaintiff ultimately can successfully graduate from Rhodes College after serving her one-semester suspension.  If this harm alleged under this factor were sufficient to outweigh the others, then every instance of a student suspension would lead to injunctive relief.

## III.  An Injunction Would Cause Harm to Others and is Against the Public Interest.

The remaining factors (namely, the relevant public and private interests) do not support Plaintiff's request for injunctive relief.  Courts have continually recognized that colleges have a well-established interest "in disciplining students who have committed serious infractions of university rules" and that the "public has a similar interest."  *Doe v. Ohio State Univ.*, 2016 WL 6925547, at *11.   Likewise, courts have been deferential to private colleges' student-led disciplinary proceedings and the outcomes of those proceedings.  *See Geraldo v. Vanderbilt Univ.*, 1997 WL 718422, at *4 (Tenn. Ct. App. Nov. 19, 1997) ("The Honor Council was fully warranted in determining that expulsion was the appropriate discipline."); *Marshall v. Ohio Univ.*, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) ("[I]ssuing a temporary restraining order in this case, and in others similar to it, would likely interfere with OU's ability to enforce its disciplinary standards"); *see also Pierre*, 143 F. Supp. 3d at 714 (noting that colleges and universities have an interest in administering their rules and regulations to provide an educational environment "free from harassment" and "conducive to study and learning for all students").  If this Court were to grant Plaintiff the injunctive relief that she seeks, such relief would undercut the entire purpose of Rhodes College's Student Code of Conduct and its Community Standards Council. Plaintiff should

18

not be allowed to vitiate Rhodes College's significant interest in applying its Code of Conduct and preserving the functions of its Community Standards Council by asserting meritless claims.  This interest is particularly prominent here, where the Plaintiff has named individually the student President of the CSC as a Defendant and an individual student who has the right to express her opinion of Plaintiff's conduct despite serving as a resident assistant.[10]  The public and private interests accordingly point toward the denial of injunctive relief to Plaintiff.

## CONCLUSION

Plaintiff sent a text message, the substance of which caused repercussions that were determined to violate Rhodes' Standard of Conduct, and she was given a one-semester suspension. The facts here are not extraordinary, and they are undisputed. Plaintiff can point to no procedural defect in the process that was not cured on appeal and rehearing.  The decision to suspend her for her offense can in no way be considered arbitrary or capricious.  Plaintiff is therefore unlikely to succeed on her claims, and she does not face irreparable harm.

The injunctive relief sought here otherwise harms both Rhodes and the public interest.  The issuance of injunctive relief would nullify the long-standing tradition at Rhodes of student-led disciplinary councils.  Providing Plaintiff her requested relief would send a message to every student that receives discipline through such a process for violations of codes of conduct at an institution of higher education that they can simply file a scattershot federal lawsuit to avoid the consequences of their actions.

---

[10] Plaintiff appears to allege that the fact that Ms. MgBoh serves as a resident assistant ("RA"), for which she receives a stipend from Rhodes, should automatically impute any statement she makes to Rhodes.  There is no legal basis for such a claim.  The recipient does not live on campus and therefore could not have forwarded Plaintiff's text to Ms. MgBoh in order to seek her advice as an RA, and none of Ms. MgBoh's actions were taken in her capacity as an RA.

For the foregoing reasons, Defendants respectfully submit that Plaintiff's request for injunctive relief should be denied. Plaintiff has failed to satisfy the substantial burden of showing that such relief is warranted under the facts and circumstances of this case or under applicable law.

Submitted this 12th day of January, 2022.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC

/s/ Lisa A. Krupicka
Lisa A. Krupicka (BPR #12147)
Sarah Elizabeth Stuart (BPR #35329)
130 N. Court Avenue
Memphis, TN 38103
T: (901) 524-5000
F: (901) 524-5024
lkrupicka@bpjlaw.com
sstuart@bpjlaw.com
*Attorneys for Defendants*

20