IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS

| | |
|---|---|
| KENDALL FOREMAN,<br><br>    *Plaintiff*,<br><br>v.<br><br>RHODES COLLEGE, DAVID CADDLE, AMAKA MgBOH, AND RICHARD ADAMS,<br><br>    *Defendants*. | Case No. 2:21-cv-02811-JTF-tmp |

### PLAINTIFF'S POST-HEARING BRIEF[1]

The Plaintiff, Kendall Foreman, respectfully submits this supplementary brief, pursuant to the Court's leave. As set forth below, (1) Ms. Foreman was entitled under the Rhodes College Community Standards Council (the "CSC") Constitution to question the three accusers who testified against her at her CSC hearing on November 18, 2021, and (2) by preventing her from doing so Rhodes was in substantial noncompliance with its contractual obligations.

### I.   FIRST ISSUE: RIGHT TO CONFRONT ACCUSERS

The parties disagree over whether the CSC Constitution guarantees a student charged by the CSC with violation of the Rhodes Social Regulations Code the right to question her accusers if they testify against her at a CSC hearing. The appropriate inquiry here is how Rhodes "should reasonably expect" its students to interpret the controlling document. *Bose v. De La Salud Bea*, No. 2:16-cv-023087, 2018 WL 8919932, at *7 (W.D. Tenn. Feb. 27, 2018) (Fowlkes, J.) (quoting

---

[1] Excluding those portions exempted under Local Rule 7.1(d) from page-length calculations, this filing satisfies the six-page limit for which leave to file was granted.

*Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir, 1988)). While deferential, *see id.*, the reasonable-expectation standard is not unbounded. Universities cannot posit novel interpretations, outside the "range of reasonable expectations of one reading the relevant rules," to justify their own violations of policy. *See Doe v. Transylvania Univ.*, 2020 WL 1860696, at *9 (quoting *Faparusi v. Case Western Reserve Univ.*, 711 F. App'x 269, 277 (6th Cir. 2017)).

The CSC Constitution provides at Article IV, Section 2.D that, in addition to being present in the hearing "to hear all evidence presented" against him or her,

> The accused may offer such proof as is relevant and material to any issue coming before the Community Standards Council for decision in his or her hearing, including, without limitation, the calling of witnesses with relevant knowledge *and the questioning of Council witnesses*.

*Id.*, Golston Decl., Ex. A (ECF No. 27-2) (emphasis added). The CSC sent Ms. Foreman this very provision in response to a procedural question she posed prior to her hearing. **Foreman Decl.**, Ex. 1 at 1.

While the CSC Constitution does not explicitly define "Council witnesses," the term's only reasonable interpretation in context is in reference to witnesses called by the CSC rather than the accused. This coheres with the description of who may testify at a CSC hearing: "The Council may call witnesses relevant to the case. The Accused may request additional witnesses with relevant knowledge and present any other relevant evidence." Art. IV, sec. 3.7. There are no ambiguities here: the language contemplates witnesses called by the CSC and, in addition to these, witnesses the accused may call on her own behalf. Because the CSC called and questioned Mses. Henderson, Mire, and Oluwafikemi, these women were Council witnesses.

Rhodes argues that, because the three women were Ms. Foreman's accusers, they were "not witnesses," meaning "Ms. Foreman had the right to hear their testimony but not question

2

them." **Ex. A** at 1. This is an apparent contradiction in terms.[2] The very *meaning* of "testimony" *is* "[e]vidence [given by] a competent witness under oath or affirmation." *Black's Law Dictionary* 1704 (10th ed. 2014); *see also Witness*, *id.* at 1838 ("Someone who gives testimony under oath or affirmation . . . ."). The accusers were witnesses because they testified under oath.

Certainly, universities may give exotic definitions to terms in their own regulations if they choose. But the reasonable-expectation standard would require making idiosyncratic meanings explicit. Nothing in the CSC Constitution indicates that "witness" and "accuser" designate separate, mutually distinct roles in the hearing process. Indeed, the opposite appears true: Article IV, Section 3.A.4 provides, "Witnesses *other than* the Accuser and Accused may be present only during their own testimony" (emphasis added). The qualifying language here would be superfluous if accusers could not also be witnesses.

## II.   SECOND ISSUE: SUBSTANTIAL NONCOMPLIANCE

Ms. Foreman concedes that substantial compliance is the appropriate standard here. But she disagrees with Rhodes about what the standard requires. Relying on *Valente v. Univ. of Dayton*, 438 F. App'x 381 (6th Cir. 2011), the Rhodes argues that the proper focus is not on whether it violated its own procedures, but whether it "somehow 'abused its discretion' by acting 'unreasonably, arbitrarily, or unconscionably.'" Defs.' Resp. Opp. Prelim. Inj. [hereinafter Resp.] 13 (ECF No. 19, PageID 86). Although Ms. Foreman's suspension *was* unreasonable, arbitrary, and unconscionable, that is not the proper standard to apply here. *Valente* applied the substantive

---

[2] It is also a new angle. The CSC referred to the three accusers as "witnesses" throughout the disciplinary and appeals-committee proceedings. Tr. Appeals Comm. Hr'g (ECF No. 31 Ex. 8) 40:13,21 (referring to all three accusers); Tr. CSC Hr'g (ECF No. 27-1) 12:18,19 (all three), 29:4,5, 30:4,6 (Ms. Henderson), 38:13, 39:11 (Ms. Mire), 46:4, 47:4,5, 51:5 (Ms. Oluwafikemi), 61:25 (all three). Even Rhodes' attorneys appeared to consider these women witnesses (in addition to accusers) earlier in these proceedings. *See* Resp. 12–13 n.6.

law of a different forum state. *See* 438 F. App'x 384–85 (citing Ohio caselaw).

This is a diversity action at contract. Tennessee law governs the question of breach. *See Bose*, 2018 WL 8919932, at *7 (citations omitted). In contrast, *Valente* deferred to longstanding Ohio precedent, *see* 438 F. App'x 384–85, which granted private universities a "broad range of discretion" with respect to enforcing both "disciplinary requirements" and "scholastic standards." *See, e.g.*, *Schoppelrei v. Franklin Univ.*, 228 N.E.2d 334, 336 (Ohio Ct. App. 1967).

Tennessee law is less circumscribed. *See Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (2005). Courts still will not go so far as to "advocate for" private-university "best practices." *Doe v. Vanderbilt Univ.*, No. 3:18-cv-0569, 2019 WL 4748310, at *12 (M.D. Tenn. Sep. 30, 2019). But "the usual, very deferential, standard" applicable to *academic* questions "does not apply" to *disciplinary* matters. *Doe v. Univ. of S.*, No. 4:09-cv-62, 2011 WL 1258104 at *19, (citing *Doherty v. S. College of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988)). For these, "a more intrusive analysis" is appropriate,[3] *Atria*, 142 F. App'x at 255—namely one that *does* look to whether a university followed its own rules. *See Anderson*, 450 F. App'x at 504 (citing *id.* at 255–56).[4]

There is no bright line for assessing substantial compliance under the less deferential standard, but a starting point is the recognition of "a duty of good faith and fair dealing" in the student-university context. *Univ of S.*, 2011 WL 1258104, at *18 (quoting *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003)). In disciplinary proceedings, "[t]he implied

---

[3] Lest there be any doubt as to the non-academic nature of its rulings, the Rhodes CSC recently described itself in a public Instagram post as the Rhodes' "primary *non-academic* adjudicating council." **Foreman Decl.** Ex. 2 at 1 (img. 3 of 7) (emphasis added). Also in the post was the CSC's apparent public admission that it "was seen" by Rhodes student government "as a problem rather than an asset." *Id.* (img. 2 of 7). The statement cuts against Rhodes' claim that CSC speaks for "the voice of the student community"—the so-called "relevant public" (whatever that means). *See* Rhodes Suppl. Br. 17 (ECF No. 27).

[4] The Southern District of Ohio likewise embraced this analysis four years after *Valente*. *See Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (2015).

covenant of good faith and fair dealing creates a duty to provide basic [or fundamental] fairness." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d. 648, 699 (M.D. Tenn. 2018). Substantial compliance must entail basic fairness, because courts have rejected the notion that disciplinary proceedings could be fundamentally *un*fair while in compliance with a university's procedures designed to *be* fair. *See id*.

The contrapositive follows that a *lack* fundamental fairness is *dispositive* of substantial compliance. "The proper focus in analyzing whether a private university provided fundamental fairness is whether [it] adhered to its [own] misconduct procedure." *Doe v. Belmont University*, 334 F. Supp. 3d 877, 891 (M.D. Tenn. 2018). Historically, courts have rejected fundamental-fairness challenges to alleged procedural deficiencies for one of three reasons: (1) unsupported allegation of bias;[5] (2) assertion of a procedural right not guaranteed by the school;[6] or (3) harmlessness of the alleged violation.[7] Issues of bias aside, the foregoing suggests a private university substantially breaches its contractual obligations in a student-disciplinary matter if it breaks its own rules, *unless* it can show the violations did not prejudice the outcome.

Once Rhodes referred Ms. Foreman's case to the CSC and charged her, it had a duty to hear her case in conformity with the CSC Constitution and afford her all procedural safeguards

---

[5] *E.g.*, *Atria*, 142 Fed. App'x at 256 (presumption of integrity absent showing of "actual bias"); *Vanderbilt*, *id.* at *12; *Belmont*, 334 F.Supp. at 896–97 (requiring fact-specific allegations); *Z.J.*, 355 F. Supp. at 696–97 (same).

[6] *E.g.*, *Anderson*, 450 Fed. App'x 503 (no right to suppress or limit accuser's testimony); *Vanderbilt*, 2019 WL 4748310, at *12–13 (no right to counsel, cross-examination, or specific outcome); *Belmont*, 334 F. Supp. at 893–95 (same); *Z.J.*, 355 F. Supp. at 694–985 (no right to have specific witnesses interviewed or certain evidence deemed exculpatory).

[7] *E.g.*, *Anderson*¸ 450 Fed. App'x 504 (harmless to admit accusing professor's calculation of mathematical probability of identical pattern of answers on quiz where accused student had previously admitted likelihood was "vanishingly small"); *Atria*, 142 Fed. App'x at 256 (rejection of initial appeal harmless upon acceptance of second appeal).

due thereunder. It did not owe these safeguards in the abstract, but under its own written policy for the process it chose to subject her to. Thus, unlike the plaintiffs in *Vanderbilt* or *Belmont*, Ms. Foreman had the right to cross examine her accusers. Rhodes admits it prevented her from doing so. Resp. 11. The blatant breach was also a substantial one, because Rhodes cannot show it was harmless.

Contrary to Rhodes' repeated refrain, there were and are disputes of fact here. Ms. Foreman does not face suspension for sending a racially offensive text to her Black best friend. She would have no case if that were the end of it. Instead, the sanctions purport to stand on clear and convincing evidence that Ms. Foreman caused a *reasonable* apprehension of *physical* harm to the Rhodes community at large. The charge has something like an element of *damages* (for lack of a better term) that she has all along disputed. The only evidence that anyone feared physical harm was the accusers' testimony. True, they said they feared for their safety. But in what sense precisely? Was it fear of literal, physical harm—or safety in the broader sense of social comfort, akin to a "safe space" like Ms. Mire referenced? *See* Tr. CSC Hr'g 44:13. There was also the objective, fact-specific reasonability question. Did the accusers omit details that might have pointed to delusion or conspiratorial groupthink? If such questions seem reaching, that is precisely the point. Rhodes' observation—that it is "unclear" how Ms. Foreman might have developed her accusers' testimony, *see* Suppl. Br. 12—cuts both ways.

It is well established that cross-examination—"beyond any doubt the greatest legal engine ever invented for the discovery of truth," John H. Wigmore, *Evidence in Trials at Common Law* § 1367 (James H. Chadbourn ed. 1974)—"is necessarily exploratory." *Alford v. United States*, 282 U.S. 687, 692 (1931). Where the right to cross examination exists, "reasonable latitude must be given the cross-examiner," because she cannot know *a priori* how the testimony "might develop."

6

*See id.* For the same reason, deprivation of the right is generally uncurable by any post-factum "showing of want of prejudice"—i.e., harmless error. *Brookhart v. Janis*, 384 U.S. 1, 3 (1966). The deprivation is *inherently* harmful; "[p]rejudice ensues from a denial of the *opportunity* to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *See Alford*, 282 U.S. at 692 (emphasis added). So too here. Rhodes substantially breached its own rules by preventing Ms. Foreman from questioning her accusers at the CSC hearing. It did not cure the breach by giving her a recording of the testimony after the fact. And, to the extent the CSC reviewed the accusers' same unchallenged, undeveloped testimony when it "reconsidered" Ms. Foreman's case, it merely reinforced the original sin.

### III.   CONCLUSION

Ms. Foreman's disciplinary proceedings were fatally and fundamentally flawed.

Dated February 25, 2022.

> Respectfully Submitted,
> **APPERSON CRUMP, PLC**
>
> */s/ Jacob Webster Brown*
> Bruce S. Kramer (TN 7472)
> Jacob Webster Brown (TN 36404)
> 6000 Poplar Avenue, Suite 150
> Memphis, Tennessee 38119
> Phone: (901) 756-6300
> bkramer@appersoncrump.com
> jbrown@appersoncrump.com

### IV.   CERTIFICATE OF SERVICE

I certify that this motion is filed on February 25, 2022 via the District Court's electronic-filing system and that all counsel of record will be automatically served by operation of the same.

> */s/ Jacob Webster Brown*