**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENENSSEE
WESTERN DIVISION**

| | |
|---|---|
| KENDALL FOREMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **Case No. 2:21-cv-02811-JTF-tmp** |
| | ) |
| RHODES COLLEGE, DAVID | ) |
| CADDLE, AMAKA MgBOH, | ) |
| and RICHARD ADAMS, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

Before the Court is Defendants Rhodes College, David Caddle, Amaka MgBoh, and Richard Adams' Motion to Dismiss Plaintiff Kendall Foreman's Complaint for Failure to State a Claim, filed on March 10, 2022.  (ECF Nos. 39 & 39-1.)  On March 31, 2022, Plaintiff filed an Amended Complaint.[1]  (ECF No. 40.)  On April 14, 2022, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint also for Failure to State a Claim.  (ECF Nos. 41 & 41-1.)  On May 23, 2022, Plaintiff responded in opposition, to which Defendants replied on June 10, 2022. (ECF Nos. 47 & 50.) For the following reasons, Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Failure to State a Claim (ECF Nos. 41 & 41-1.) is **GRANTED**.

---

[1]  Upon the Court's review of Plaintiff's original Complaint, the Court notes that Plaintiff has abandoned various negligence claims such as the Tennessee Human Rights Act, ordinary negligence, gross negligence, promissory fraud, negligent training and supervision, fraudulent misrepresentation, intentional infliction of emotional distress, and negligent infliction of emotional distress. However, Plaintiff's amended Complaint resubmits those negligence claims as seven breach of contract claims against Rhodes College and the Individual Defendants. (ECF No. 41-1, 2.) In addition, Plaintiff renews her claim of "false light publicity" against Defendant MgBoh.  (ECF No. 40, 11.)

## **FACTUAL BACKGROUND**

This case involves Plaintiff Ms. Kendall Foreman,[2] ("Ms. Foreman"), a White female, challenging her suspension from enrollment at Defendant Rhodes College ("Rhodes College")— a private, four-year liberal arts college in Memphis, Tennessee.  In the early morning hours of October 3, 2021, a Rhodes College student living off campus was murdered in a home invasion. (ECF No. 1, 3 ¶ 11.)  That evening, Rhodes College issued a Campus Safety Alert informing the student community that Memphis Police Department identified the suspect in the murder:

> Person of Interest
> Name: Rainess Holmes
> Age: 36
> Height: 6' 2"
> Weight: 165 pounds
> Race: Black
> Additional Note:  Holmes is thought to be working with two or three other individuals. He may be on foot or in a small green Jeep SUV.

(*Id*., ¶ 12 & ECF No. 19-1, 12.)

At 11:21 p.m. on October 3, 2021, Plaintiff sent a text message to Britney Beaty, a Black student at Rhodes College who lives off campus. The text message said "Imma be racist: If you see a Black man in the next 24hrs near your house hit him with your car."  (*Id*. at 3-4, ¶ 15.)  Upon reading the text, Ms. Beaty forwarded a screenshot of the text message to Defendant Amaka MgBoh ("Defendant MgBoh"), another Black student at Rhodes College who served as a Resident Advisor.  (*Id*. at 4, ¶ 16.)  Defendant MgBoh posted the text message to Snapchat. (*Id.*) After the posting, three Black female students at Rhodes College saw the text message and filed reports using Rhodes' Bias Education Reporting System ("BERS").  (*Id*. at 5, ¶ 23.)  The BERS

---

[2] Plaintiff is a Virginia resident and currently a student at Rhodes College having first matriculated in 2019. (ECF No. 1, 2 ¶ 3.)  Plaintiff indicate that she suffers from Attention Deficit Hyperactivity Disorder ("ADHD") which causes her to act without thinking and to overlook social cues.  (*Id.*)  Plaintiff further indicates that her processing speed is much lower than one would predict for a young adult with advanced reasoning abilities, and as a result Plaintiff takes longer to fully demonstrate her knowledge and capability.  (*Id.*)

reports were directed to Defendant Richard Adams, Director of Community Standards, ("Defendant Adams") for handling as a possible violation of the student conduct standards in Rhodes' Student Handbook. (ECF No. 19, 4.)  Upon review, Defendant Adams determined that the matter should be investigated by the Community Standards Council ("CSC"), a student-run and student-elected adjudicatory body established to deal with violations of Rhodes' Standards of Conduct.  (*Id.*)

On October 13, 2021, Defendant David Caddle ("Defendant Caddle"), the student president of the Rhodes' CSC sent Plaintiff an email notifying her that she was under investigation by the CSC for violating the Rhodes' Standards of Conduct.  (*Id*. at 6, ¶ 30; *See* Exhibit 1, Declaration of Defendant Caddle.)  In that email notification, Defendant Caddle advised Plaintiff that she would be contacted by a CSC investigator who would gather further evidence concerning the report, and that Plaintiff should notify the investigator of any relevant witnesses or information that she thought might be necessary to the investigation.  (*Id.*) Defendant Caddle further advised Plaintiff that she was entitled to select a student advisor from a list of CSC Committee members to serve as Plaintiff's advisor throughout the process and who would assist Plaintiff in the investigation.  (*Id.*)  Plaintiff selected Madison Bagsby to serve as her student advisor; they met several times[3] in advance of Plaintiff's hearing.

The CSC Constitution is publicly available on the Rhodes College website, as part of its Student Handbook.[4]  (ECF No. 19, 4.) The CSC Constitution expressly states that "[t]he Advisor's role is limited to informing the Accused concerning Community Standards Council procedures and answering any questions about those procedures. The Advisor is foremost a

---

[3] Ms. Bagsby stated that she met four times with Plaintiff prior to the CSC hearing, including one Zoom meeting with Plaintiff's parents, and that she answered or found the answer to all of Plaintiff's questions. (ECF No. 19, 6.)
[4] *See* Community Standards Council Constitution | Rhodes Handbook

member of the Community Standards Council and does not represent the Accused." (*Id.* at 5*; See* CSC Article IV, Section 1.D.)   Plaintiff asserts that Ms. Bagsby advised Plaintiff that legal counsel was not needed in her case since the case did not involve physical violence, sexual assault, or destruction of property.  (*Id.* at 7.)  Plaintiff allegedly relied on this advice and did not obtain legal counsel.  (*Id.*)

On November 15, 2021, Defendant Caddle sent Plaintiff an email providing her with notice of the charges against her and a copy of the case packet with interview summaries taken by the investigators, as well as documentary evidence acquired by or supplied to the investigators during the course of the investigation. (*Id.* at 7, ¶ 37; *See* Exhibit 1-3 and ECF No. 19-1, 95-119.)  Three days later, the hearing was held.  (*Id.* at 8, ¶ 39 and ECF No. 27, 3 ¶ 8; *See* ECF No. 27-1*,* Exhibit A, Transcript of the Community Standards Council Hearing on November 18, 2021.)   At the beginning of the hearing, Plaintiff admitted that she was responsible for Charge Number 1 that involved the endangering, threatening, or causing physical harm to any person, or causing reasonable apprehension of physical harm.  (ECF No. 27-1, 6-7 ¶ 1-8.)   Plaintiff also admitted that she was responsible for Charge Number 2 that involved engaging in intimidation, harassment, coercion, verbal abuse and/or conduct that threatens or endangers the health or safety of any reason. (ECF No. 27-1, 7 ¶ 9-13.)   Plaintiff denied responsibility for Charge 3 that involved interfering with the freedom of expression of others, which inhibits the ability of students to comfortably contribute and interact with the community. (ECF No. 27-1, 7 ¶ 14-18.)

The CSC Constitution provides in Section 3(A)(2-4) that "the Council must act with complete impartiality.  The hearing shall be taped, and the Secretary shall keep minutes of the proceedings.   Deliberations of the Council shall be absolutely private, and no record of

4

deliberations shall be made.  The Accused, and Advisor may be present during the hearing, with the exception of the Council deliberations.  Witnesses other than the Accuser and Accused may be present only during their own testimony.  The Accused may observe all evidence presented during the hearing."  (ECF No. 41-2, 8; *See* CSC Constitution, Section 3, Hearing Procedures.)

During the hearing, Plaintiff was not allowed to be in the same room with the three accusers when they testified, and the three accusers were permitted to testify in each other's presence.  In addition, the accusers were not present for Plaintiff's testimony.[5]  (ECF No. 1, 8 ¶ 45.)  Also, Plaintiff moved to introduce documentary evidence to demonstrate her public apology, her apology to the individuals, and instances where the recipient of the text message and Plaintiff used similar phrasing.  (ECF No. 27-1, 8 ¶ 6-11.)  Since the documentary evidence provided by Plaintiff was not provided to the investigator prior to the hearing, it was excluded.  (*Id.* at ¶ 12-17.)  However, Defendant Caddle advised Plaintiff that she could submit any additional evidence that would help her case, such as her documentary evidence, as part of any appeal. (ECF No. 27-1, 8-9 ¶ 22-25 and 1-5.)

During the hearing, Plaintiff stated:

> "I am prepared to accept the appropriate consequences for my actions. After realizing how quick this escalated, I published a public apology on social media within 24 hours. You have a copy of my apology on page 7 of your packet. I would like to say that I have learned a great deal about myself and what I admit was a racist comment to a friend. It was wrong and disrespectful to Black members of the Rhodes community."

> (ECF No. 27-1, 11 ¶ 7-16.)

---

[5] During Plaintiff's opening statement and testimony, the accusers were out in the hallway. (ECF No. 1, 8 ¶ 43.) Plaintiff was escorted out of the hearing room after she completed her testimony.  (*Id.*)  The accusers were then brought in the room together to testify.  (*Id.*)

After Plaintiff's acceptance of responsibility, she testified about her friendship with Ms. Beaty and how she joked with Ms. Beaty; they would exchange texts using phrases like "hit each other or others with our car, like I am going to run her over and like run me over, please, like I am having a crappy day." (ECF No. 27-1, 24-25 ¶ 20-25 and 1.)  Plaintiff further testified about her personal apology to Ms. Beaty with emphasis on the immediacy of the public apology.  (ECF No. 27-1, 18-19 ¶ 25 and 1-10.)   Plaintiff emphasized that her public apology was already included in the case packet as was her apology to the others. (ECF No. 19-1, 9 and 26; *See* Exhibit A).  Plaintiff's public apology that was posted to Instagram stated:

> "Fellow students, staff, and faculty, I am so profoundly sorry for my ignorance and blatant display of racism in response to the tragedy that affected our campus this weekend. What I said was wrong and disrespectful to the Black community at Rhodes. I apologize for the hurt I have caused and am educating myself to provide support rather than harm. I am so sorry I have let down my friends, peers, and Rhodes as a whole. I have learned that my actions hurt many people I love and respect and I sincerely apologize."

> (ECF No. 19-1, 9; *See* Instagram post at 9:11 p.m.)

Further, during a text exchange with Plaintiff, one response stated, "[a]nyways, you've been reported to BERS.  The fact that you feel like the inbox of a Black woman is a safe space to be racist is already disgusting, but already your excuse for racially profiling doesn't make me think much of you." (ECF No. 19-1, 26.)  Plaintiff replied that "you're right what I did was wrong, and I know that, and I will except the punishment that comes from my actions. I did not think of the hurt my words have and how they impact the Black community and I need to educate myself and change to support my peers of color both locally and globally." (*Id.*)

On November 26, 2021, Defendant Adams notified Plaintiff that the CSC found her responsible for violation of the Rhodes Standards of Conduct as to Charges 1 and 2.  (ECF No. 1-5; *See* Exhibit 3, Formal Outcome Letter from Defendant Adams.) Plaintiff was not held

responsible for Charge 3.  (*Id.* at 4.)  The CSC determined that Plaintiff should be sanctioned by a one-semester suspension, completion of a five-page reflection paper, and completion of a self-designed course of study approved by Defendant Adams.  (*Id.*) The outcome letter also advised Plaintiff of her appeal rights; if she was dissatisfied with the hearing decision, she should submit a Standards of Conduct Appeals Form within four (4) business days. (*Id.*)

On December 1, 2021, Plaintiff timely appealed the CSC decision to the Appeals Committee.  The Committee included the Dean of Students, Dr. Alicia Golston, the student president of the Honor Council, Meg Corley, and the Dean of Faculty Recruitment, Development, and Diversity, Dr. Justin Rose. (ECF No. 1, 11 ¶¶ 58-59 and ECF No. 1-5, 4.) Plaintiff's appeal hearing was held on December 13, 2021, where Plaintiff was allowed to present the documentary evidence that she was previously prohibited from presenting to the CSC.  (*Id.* at ¶ 60; ECF No. 19-4 and 19-5; *See* Exhibits D and E; *See also* Plaintiff's Appeal Submission; Exhibit B, Declaration of Dr. Alicia Golston.)   In Plaintiff's Rebuttal to the Community Standards Council Findings, Plaintiff stated, "I pled responsible for the first two charges since the Rhodes community feels I am responsible, and I did send the original text." (ECF No. 19-5, 5.)  Plaintiff further stated, "my sending of the original text and wording is consistent with behavior of impulsivity, acting without thinking and overlooking social cues documented in my testing assessment. This is all heightened in times of stress which is also documented. Though not an excuse, it puts my actions in context even further."  (*Id.* at 7.) Plaintiff indicated that notwithstanding the out-of-context offensiveness of the text message, there was never any indication that it caused Ms. Beatey to feel abused or harassed, or that she or any members of the Rhodes community who later saw the message out of context reasonably feared physical harm.  (ECF No. 47, 2.)

Plaintiff specified in her appeal that, "I am not deflecting blame, I sent an inappropriate text to my friend out of fear for her life due to the murder that occurred that morning.  I have stepped up to be responsible for my actions.  All parties involved should be held responsible for their actions as well."  (ECF No. 19-5, 10.)  Plaintiff further specified, "I prefaced the text with Imma be racist because I knew I was generalizing about a group, using the description released by Rhodes' security of a black male suspect."  (*Id.* at 12.)  Plaintiff commented on the recorded testimony of the three accusers at the CSC hearing, suggesting that the three accusers did not take the hearing proceedings seriously because the recording had to be stopped because of laughter coming from the hallway and the fact they brought cupcakes to the CSC hearing. (ECF No. 19-5, 6.; *See* Exhibit E.)

At the conclusion of the Appeals Committee hearing, a written decision was rendered explaining the outcome of Plaintiff's appeal. (ECF No. 27-2, 105.)  The Appeals Committee held that "while the Community Standards Council's decision was based on clear and convincing evidence according to Section 5.B.2 of the Community Standards Council Constitution, the actions of the Council could reasonably be considered in conflict with Section 5.B.1 (the provision that the original hearing was conducted fairly in light of the charges, and in conformity with prescribed procedures.)" (*Id.*)  The Appeals Committee remanded the case to the CSC to consider all evidence, including the documentary evidence Plaintiff submitted to the Appeals Committee, and if necessary, determine if its original decision and sanction should be changed. (*Id.*)

At the direction of the Appeals Committee, the CSC reconvened on December 15, 2021. Upon reconsideration, the CSC upheld its original decision in its entirety after considering all the evidence from the November 18, 2021 hearing and all submissions to the Appeals Committee,

including the evidence Plaintiff was prohibited from presenting at the November 18, 2021 CSC

hearing.  The CSC concluded the evidence was insufficient to alter the original outcome. (ECF

No. 19-6.)  The CSC reconsideration letter of outcome to Plaintiff expressly stated:

> Based upon clear and convincing evidence, CSC has determined you are the responsible party in this incident. You admitted to sending the message to your friend. We acknowledged that you have issued an apology on your social media account, attended the anti-black bias forum, and did personal research on the impact of your actions. Initially, you shared that you are willing to learn, grow, and apologize to the students affected and the Rhodes community.
>
> You have argued that your intent was only to warn a friend of potential harm. However, the language you chose cannot reasonably be read to convey that intention, since it merely advised her to hit the next Black man she sees with her car. Nor can there be any questions that such advice would be perceived as threatening to a Black person. Your actions have therefore caused a sense of harm and endangerment for students on campus and individuals within the greater Memphis community. Your actions directly violate the Standards of the Rhodes Community including the Commitment to Diversity with regards to discrimination and failing to respect fellow students on campus.
>
> During the appeals process, you demonstrated a lack of responsibility by blaming others for causing harm to the Rhodes community when in fact you created the message. The suspension is intended to allow you the space to focus on the learning and education you admitted to needing in order to live in a diverse educational community.
>
> The decision of the CSC is final.
>
> (ECF No. 19-6, 3; *See* CSC Reconsideration Letter dated December 16, 2021.)

Pursuant to Section 6 of the CSC Constitution at Rhodes College, the second decision of the

CSC is the final decision. (ECF No. 41-2, 10.)

## LEGAL STANDARD

Defendants seek dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (The court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true."). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In other words, although the complaint need not contain detailed facts, its factual assertions must be substantial enough to raise a right to relief above a speculative level. *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). However, "'naked assertions devoid of further factual enhancement' contribute nothing to the sufficiency of the complaint." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Determining whether a complaint states a plausible claim is "context-specific," requiring the Court to draw upon its experience and common sense. *Iqbal*, 556 U.S. at 679. Defendants bear the burden of "proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 433 (6th Cir. 2008).

While the Court's decision to grant or deny a motion to dismiss "rests primarily upon the allegations of the complaint, 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint [] also may be taken into account.'" *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (quoting *Amini v. Oberlin Coll.*, 259 F.3d

493, 502 (6th Cir. 2001)).   The Court may also consider "exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein."  *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011) (citation omitted).

## ANALYSIS

In this case, Tennessee law controls.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).  For claims based in contract law, "Tennessee follows the rule of *lex loci contractus*, meaning it presumes that the claims are governed by the jurisdiction in which the contract was executed absent a contrary intent."  *Town of Smyrna v. Mun. Gas Auth. of Ga.*, 723 F.3d 640, 645 (6th Cir. 2013).  The relevant contracts in this case are the Rhodes College's Community Standards Council Constitution and the Rhodes' Standards of Conduct for a private educational institution.  The contracts became binding when Plaintiff enrolled at Rhodes College in Tennessee.

In essence, this matter concerns Plaintiff's feeling that she was treated unfairly and her disagreement with the outcome of the disciplinary process at Rhodes College, which is governed by the CSC constitution.[6]  (ECF No. 40, ¶¶ 9-12, & 16.)  Plaintiff has raised seven breach of contract claims against Rhodes College, Defendant Adams, Defendant Caddle, and Defendant MgBoh.  Plaintiff also renews her claim of "false light publicity" for invasion of privacy against Defendant MgBoh.  The Court evaluates Plaintiff's reframed causes of action below.

### I.   Breach of Contract –  Defendant Rhodes College (Count I)

---

[6] Plaintiff raises new allegations about the appellate hearing procedures such as (1) that she was not permitted to consult with her attorneys before answering certain questions in the Appeals Committee Hearing; (2) that the Appeals Committee did not let her speak again after Defendant Caddle allegedly lied while answering the Appeals Committee's questions; and (3) that "Rhodes' relevant disciplinary procedures" do not offer a further means to challenge the decision on appeal and reconsideration outside of filing a lawsuit. (ECF No. 40, ¶¶ 13-15, & 17.)

In Tennessee, a breach of contract claimant must provide evidence of (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach, and (3) damages proximately resulting from the breach. (*Id.* at 29.)  In the context of a student attending a private college, "[t]he Tennessee Supreme Court 'has not…enunciated the standard which should be applied in a dispute arising out of the university-student relationship.'"  *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011) (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d. 570, 577 (6th Cir. 1988)).   Generally, the relationship between a student and a private university is contractual in nature. (*Id.*)  However, even though a student-university relationship is contractual in nature, "courts have rejected a rigid application of contract law in this area." *Doherty*, 862 F.2d at 577.   "A student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." *Anderson*, 450 F. App'x at 502.   In this context, the validity of a breach of contract claim is determined by whether an educational institution "substantially complied" with its own procedures or rules. *See Anderson v. Vanderbilt Univ.*, No. 3-09-0095, 2010 WL 2196599, at *13, 2010 U.S. Dist. LEXIS 52381, at *37 (M.D. Tenn, May 27, 2010), *aff'd*, 480 F. App'x 500 (6th Cir. 2011) (per curiam).   In addition, courts must remain mindful that a college or university's disciplinary committee is entitled to a presumption of honesty and integrity.  *See Anderson*, 2010 WL 2196599, at * 38.

Accordingly, "the implied covenant of good faith and fair dealing creates a duty to provide basic fairness, and that duty can be met by complying with the terms of the Handbook generally, and the disciplinary process is designed to be fair." *Z.J. v. Vanderbilt Univ*, 355 F. Supp. 3d 646, 699-700 (M.D. Tenn. 2018).   To put it differently, an implied covenant of good faith and fair dealing is imposed on every contract and applies in the context of school

disciplinary proceedings.  It creates an independent duty to provide basic fairness.  Also, courts have widely recognized that procedural rights in a student-university breach of contract claim only exist if guaranteed by the school.  *Z.J.*, 355 F. Supp. 3d at 697.  However, "it is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975).  "[A] university is not a court of law, and it is neither practical nor desirable for it be one." *Pierre v. Univ. of Dayton*, No. 3:15-CV-362, 2017 WL 1134510, at *8 (S.D. Ohio Mar. 27, 2017) (quoting *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 n.1 (6th Cir. 2005)).

Plaintiff argues that procedural violations committed by Rhodes College breached its contractual obligations to Plaintiff under the CSC Constitution.  More specifically, Plaintiff alleges that Rhodes College breached the CSC Constitution by "(a) not providing Plaintiff in advance with a meaningful list of written hearing procedures; (b) denying Plaintiff the opportunity to hear all evidence against her by sequestering Plaintiff from the CSC hearing during her accusers' testimony; (c) denying Plaintiff the opportunity to question the CSC's witnesses by sequestering her from the CSC hearing during her accusers' testimony; (d) disallowing Plaintiff the right to present documentary evidence in her favor; and (e) finding Plaintiff responsible for abuse or harassment and causing the apprehension of physical harm absent a preponderance, let alone clear and convincing evidence." (ECF No. 40, ¶ 23.)  Plaintiff further alleges that Rhodes College breached its duty of fundamental fairness under the implied covenant of good faith and fair dealing by "(a) misinforming Plaintiff at an early stage of the CSC's investigation that her CSC Advisor was to serve as her advocate; (b) misinforming Plaintiff that she was not in danger of facing serious sanctions; (c) misinforming Plaintiff, through her CSC Advisor, that the charges she faced were not serious enough to benefit

substantially from retaining legal counsel; (d) requiring Plaintiff to enter pleas, without advance notice, as to each of her alleged violations; (e) allowing Plaintiff's accusers to testify in each other's presence at the CSC hearing; (f) discrepancies in the record between the formal charges the CSC brought against Plaintiff and what she was convicted of; (g) holding Plaintiff solely and wholly responsible for the alleged harm that, if it occurred at all, occurred only as the result of third parties' independently and maliciously making Plaintiff's private text message public; (h) subjecting Plaintiff to sanctions disproportionately harsh compared to what has been imposed in other cases; (i) disallowing Plaintiff from responding to Defendant Caddle's dishonest misrepresentations to the Appeals Committee at the Appeals Committee Hearing; and (j) after a reconsideration of Plaintiff's suspension by the CSC that was made summarily, failing to offer further means of verifying the fairness of the CSC's decision on reconsideration or a further means to challenge the decision or sanctions other than by filing a lawsuit." (ECF No. 40, ¶ 23.)

Rhodes College responds that Plaintiff's allegations fail to identify a breach of the terms of the contract at issue. (ECF No. 41-1, 3.) Rhodes College asserts that Plaintiff's allegations are a challenge to the outcome of the disciplinary process, not Rhodes College's failure to follow a particular rule or process. (*Id.*) Specifically, Plaintiff fails to identify any procedural errors in the November hearing, the appellate process and subsequent reconsideration by the CSC that constitute a breach of the university-student contract. *Bose v. De Salud Bea*, No. 2:16-cv-02308-JTF-tmp, 2018 WL 8919932, at *7 (W.D. Tenn. Feb. 27, 2018) (citing *Anderson*, 450 F. App'x 500 at 502). Rhodes College also argues that Plaintiff's complaint that she was not given an appeal after reconsideration by the CSC is nothing more than Plaintiff's desire for a second appeal which is not available under the CSC Constitution. (*Id.*) Rhodes College emphasizes that Plaintiff's allegations are only subjective opinions about the fairness of the outcome; but

subjective opinions are not relevant to any of her breach of contract claim. (*Id.*)   According to Rhodes College, Plaintiff's true desire is for this Court to second-guess the outcome of the process and substitute its judgment for that of the College. (ECF No. 41-1, 4.)

The Court has reviewed the entire record as submitted by the parties and finds that the disciplinary process at Rhodes College provided basic fairness and that there was substantial compliance with the terms of the CSC Constitution.  There is nothing in the record that suggests that the CSC or the Appeals Committee was dishonest or acted without integrity.  Plaintiff's litany of alleged procedural violations of the CSC Constitution and the CSC hearing process, in large part, only challenge the outcome of the overall disciplinary process at Rhodes College, but do not identify any instances where Rhodes College did not substantially comply with the CSC Constitution or Rhodes' Standards of Conduct for a private educational institution.  Plaintiff's disappointment with the process, in the Court's view, is nothing more than her subjective opinion about the fairness or lack of fairness of the final outcome. The Court agrees with Rhodes College that a subjective opinion is insufficient to support a claim for breach of contract in Tennessee. As argued, the implied covenant of good faith and fair dealing creates a duty to provide basic fairness in the process. That duty was satisfied when the CSC Committee made its initial decision, and the Appeals Committee remanded the matter back to the CSC Committee for reconsideration of their initial decision.  The CSC considered the evidence a second time, this time including all of Plaintiff's submissions.  As we know, the additional evidence did not result in a different decision.  In this regard, Plaintiff has failed to plead facts that would allow this Court to reasonably infer that the Defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678.

Although the student-university relationship is contractual in nature, courts have rejected a rigid application of contract law in this area.  The CSC is not a court of law but is a student-run discipline process. This Court will not set aside the CSC decision to discipline Plaintiff for her action unless the CSC failed to substantially comply with CSC constitutional rules and procedures or acted arbitrary or capriciously.  The Court finds the CSC's application of the CSC Constitution's terms during its first hearing and the reconsideration hearing exemplified more than a basic sense of fairness. For example, the CSC sequestered both the Plaintiff and the individual Defendants during each other's testimony, even though the CSC Constitution provides "the Accused may observe all evidence presented during the hearing." (ECF No. 41-2, 8; *See* Section 3(A)(4), Hearing Procedures.)  The use of the term "may" provides the CSC flexibility. It does not mean that observation of testimony was required or was a right under the circumstances. Also, the Court notes that the hearing was recorded for Plaintiff to review at a later time, if needed. Additionally, Plaintiff argues the process was unfair because she was not allowed to present any documentary evidence during the hearing on November 18, 2021, and that she was not informed that her evidence should have been submitted prior to the hearing. The Court finds this argument has no merit.  In reviewing the entire process, it is true that Plaintiff's effort to submit evidence during the hearing was rebuffed.  However, this additional evidence was considered by the Appeals Committee and the CSC upon remand. The CSC nonetheless affirmed its decision which is final under the CSC's Constitution.  There was no breach of contract because Rhodes College ultimately complied with the requirements of the Constitution.

Plaintiff admitted to sending the racist text by stating "Imma be racist: If you see a Black man in the next 24hrs near your house hit him with your car."  It is true that Plaintiff followed

that statement with a public apology.  However, there is no question that racist rhetoric like this is a serious issue in the aftermath of hate crimes committed in cities and on college campuses across the country.  All such racist rants are unacceptable even if presented in a joking manner. As in this case, when such racially insensitive rhetoric is disseminated in any way, even as a joke, it is difficult to measure the harm and hurt felt by the target or others that received the rant. Just as important is the realization that dissemination of the kind in this case may inflame others to act in the way suggested in Plaintiff's text.

Plaintiff admitted that she was responsible for Charge Number 1 that involved endangering, threatening, or causing physical harm to any person, or causing reasonable apprehension of physical harm.  (ECF No. 27-1, 6-7 ¶ 1-8.)  Plaintiff also admitted that she was responsible for Charge Number 2 that involved engaging in intimidation, harassment, coercion, verbal abuse and/or conduct that threatens or endangers the health or safety of any person. (ECF No. 27-1, 7 ¶ 9-13.)  She indicated that she was prepared to accept the consequences. It does not appear that anyone pressured Plaintiff to accept responsibility for the offenses.   The Court assumes from the record that Plaintiff plead "responsible" because she was, in fact, "responsible" for the offenses charged against her.  The difficulty in understanding Plaintiff is that initially she assumed responsibility for her actions, but now wants the Court to intervene to reverse the final decision of the CSC.  Her only reason for bringing this lawsuit is because of her personal belief that the punishment she received was too severe.  However, Plaintiff has failed to plausibly allege concrete evidence to support her claim that Rhodes College failed to substantially comply with its own rules and procedures. The Court is unable to draw a reasonable inference that Rhodes College is liable for the misconduct that Plaintiff alleges.  Disappointment is not a valid

basis for a breach of contract claim.  Accordingly, the cause of action as to Count I is dismissed for failure to state a claim.

## II.   Breach of Contract – Defendant Adams, Defendant Caddle, Defendant MgBoh, and Defendant Rhodes College (Count II through Count VII)

In her original Complaint, Plaintiff alleged various torts against Defendants Adams, Caddle, and MgBoh.  (ECF No. 1, ¶¶ 19-22.)  However, upon filing her Amended Complaint, at first glance, it appears Plaintiff abandoned all tort claims.  In reality, Plaintiff attempts to impute to the named Defendants her alleged tort claims thru the contractual agreement between Plaintiff and Rhodes College.[7]

As stated previously, a breach of contract in Tennessee requires a valid and enforceable contract with a deficiency in performance amounting to a breach resulting in damages as a consequence.  *Alsbrook v. Concorde Career Colleges, Inc.*, 469 F. Supp. 3d 805, 851 (W.D. Tenn. 2020) (quoting *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011)).  For a contract to be enforceable, it requires "(1) adequate consideration; (2) mutual assent of the entering parties; and (3) sufficient definition as to be enforceable." (*Id.*) (quoting *Setzer v. First Choice Lending Servs.*, *LLC*, No. 18-5192, 2018 WL 7500477, at *4 (6th Cir. 2018)).  The obligations must be sufficiently explicit "so that a court can perceive what are the respective obligations of the parties." (*Id.*)  However, "[a] court's review under a breach of contract theory for violations of a university's established disciplinary procedures are limited to whether the procedures used were arbitrary, capricious, or in bad faith." *Heyman v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, No. 2:15-CV-1228-APG-GWF, 2019 WL 1177960, at

---

[7] The Court is concerned by Plaintiff's efforts to restate her negligence or willful misconduct claims in contracts rather than torts.  Such claims are based in tort concepts, which are generally unrelated to breach of contract. *See Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S. Ct. 754, 755 (1903) ("If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach.").

*9 (D. Nev. Mar. 12, 2019). As a result, the *Heyman* Court found that no contract existed between the student and individual defendants and that claims based on actions of the university's agent were claims against the university. As a result, the *Heyman* Court dismissed the breach of contract claims involving defendants in their individual capacity, which is analogous to the individual Defendants named in the instant case. In following this logic, the claims against the individually named Defendants should be dismissed.

The Sixth Circuit's position on abandonment of claims is straight-forward. "A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address and support it in response…" (ECF No. 47, 9; *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013)). Plaintiff states in her response "the next category of claims is those for emotional distress based on the way that Mr. Caddle and the CSC treated Ms. Foreman following her CSC hearing. Unartfully re-pleaded as a species of contract claim in Plaintiff's Amended Complaint, these claims properly sound in negligence, as set forth in Plaintiff's original Complaint.[8]" (ECF No. 47, 9.) Defendants argue that Plaintiff concedes in her Response Brief that her remaining breach of contract claims against Rhodes College, Defendant Caddle, Defendant Adams, and Defendant MgBoh are materially rooted in negligence and thus not properly pleaded as breach of contract claims. (ECF No. 50, 6.) Therefore, Defendants contend that Plaintiff's Response Brief constitutes abandonment of her tort-based "breach of contract" claims as to Count II through Count VII.

It appears that Plaintiff abandoned the breach of contract claims that "properly sound in negligence" because they were not properly addressed in her Response Brief. Plaintiff's choice

---

[8] The Court notes that Plaintiff did not incorporate her original negligence claim into her Amended Complaint and, therefore, any claim that appears in negligence is not properly before this Court. (*See* ECF No. 40, ¶ 8) (incorporating the factual allegations presented in paragraphs 11-68 of Plaintiff's Original Complaint).

of words and phrases is troubling, as even the "unartfully re-pleaded" characterization of the breach of contract claims still sound in negligence. This attempt to refer back to her original Complaint's drafting is unhelpful. Either Plaintiff argues a negligence claim or a breach of contract claim.  However, to plead a breach of contract claim under the guise of a negligence action ignores basic tort and contract law.  These are two different areas of law, with separate rationales, remedies, and needed support.  From the Court's view, these unartfully re-pleaded claims that Plaintiff failed to address and provide a supportive basis for are abandoned.

Plaintiff has failed to state a claim regarding the existence of a contract between Plaintiff and named Defendants Adams, Caddle, and MgBoh. Additionally, the breach of contract claim against Rhodes College is cast as a negligent infliction of emotional distress claim based solely on actions taken by Defendant Caddle and the CSC Committee.  Even considering this negligence claim, reframed as a breach of contract claim, against Rhodes College, the Court finds that Plaintiff failed to state a claim because there is no contractual relationship between Plaintiff and the individually named Defendants.  Moreover, even if there was a contractual relationship between Plaintiff and the individually named Defendants, Plaintiff has not sufficiently alleged how Rhodes College's disciplinary process concerning Plaintiff's conduct was arbitrary, capricious, or performed in bad faith. Again, the Court is unable to draw a reasonable inference that Rhodes College and the individually named Defendants are liable for the misconduct that Plaintiff alleges.

However, out of an abundance of caution, to the extent these claims were not abandoned due to Plaintiff's failure to address or provide support for the claim in her response, the Court will address the breach of contract claims against the individual Defendants.

1. *Defendant Adams (Count II – Breach of Contract) and Defendant Caddle (Count III – Breach of Contract)*

Count II and Count III claim that Defendant Adams and Defendant Caddle breached their contractual obligation to make sure the first CSC hearing followed the CSC Constitution.  At the outset, it appears that Plaintiff has failed to sufficiently plead or allege a contractual relationship with Defendants Caddle or Adams. Next, the Court has already found that the entire disciplinary process, which includes the original CSC hearing, the subsequent appeal and the CSC's reconsideration after remand, did not violate the CSC Constitution. The actions of the CSC and the Appeal Committee were not found to be arbitrary, capricious, or in bad faith.  (ECF No. 41-2, 10; *See* Section 5, Appeals.)  Of note, the CSC Constitution states, "a reconsideration of the sanctions imposed shall not result in a more severe sanction for the Accused student.  The second decision of the Community Standards Council shall be final."  (*Id.*; *See* Section 6, Reconsideration of Council's Decision.)   Rhodes College, the CSC and the Appeal Committee substantially complied with all rules and procedures. Therefore, the breach of contract claims in Count II and Count III are dismissed for failure to state a claim.

### 2. *Rhodes College (Count IV – Breach of Contract)*

As stated previously, in Count IV, Plaintiff asserts a breach of contract claim against Rhodes College arguing that Rhodes College had a contractual obligation to take reasonable steps to ensure Plaintiff's safety and her mental and physical well being while attending a mandatory proceeding on campus. (ECF No. 40, 6 ¶¶ 33-34.)  Plaintiff argues that Rhodes College breached its obligation, which caused Plaintiff to suffer "severe mental anguish as a result of abandoning her following the devastating news of her suspension."  (*Id.*)  Defendant responds that Plaintiff does not identify any contractual obligation that was breached by Rhodes College.

21

Mental anguish alone is not a sufficiently certain damage under contract theory.  In order to make out a case of mental anguish or intentional infliction of emotional distress, a plaintiff must show: (1) intentional or reckless conduct; (2) which is so outrageous that it is not tolerated by civilized society; and (3) the conduct results in serious mental injury.  *In re Jenkins*, 488 B.R. 601, 617-18 (E.D. Tenn. 2013); *see also Bain v. Wells,* 936 S.W. 618, 622 (Tenn. 1997).  In addition, a breach of contract is not by itself actionable under the tort of outrageous conduct. Similarly, actions in negligence or an inadvertent act will not support such a claim.  *Chandler v. Prudential Ins. Co.*, 715 S.W. 2d 615, 623 (Tenn. Ct. App. 1986.)  Thus, a claim for a breach of contract must fail when it is only supported with allegations of mental anguish or other emotional distress type damages.  Damages for breach of contract are found within the contract. *See Kindred v. Nat'l Coll. of Bus. & Tech., Inc.*, No. W2014-00413-COA-R3-CV, 2015 WL 1296076, at *5-7 (Tenn. Ct. App. Mar. 19, 2015) ("Damages in breach of contract cases are nothing more than payment in money for actual losses caused by the breach of contract, and that uncertain, contingent, and speculative damages are not recoverable for breach of contract as a matter of law.").

It appears that Plaintiff was speaking with her parents after the CSC hearing concluded. Given that fact, as well as all surrounding circumstances, there is no evidence in the record that Defendants intentionally acted in an arbitrary, capricious, or bad faith manner by leaving Plaintiff in the building with the lights off.  Accordingly, Count IV is dismissed for failing to state a recoverable breach of contract claim.

   3.  *Defendant Caddle (Count V – Breach of Contract)*

Similarly, Count V is a restatement of the claim presented in Count IV, but as to Defendant Caddle.  Plaintiff argues that Defendant Caddle had a contractual obligation to ensure

Ms. Foreman's "safety and her mental and physical well being [sic]" and he breached that obligation by the "harsh and insensitive manner" in which the CSC treated her after rendering its findings.  (ECF No. 40, 6 ¶ 33.)  Based on the same reasoning in Count IV, the Court finds that Count V is dismissed for failing to state a breach of contract claim.

    *4.*  *Defendant MgBoh (Count VI – Breach of Contract)*

Count VI involves a breach of contract claim against Defendant MgBoh. As the Court already established, for a contract claim to survive, Plaintiff must allege facts that establish a contractual agreement, including mutual assent, with Defendant MgBoh. *Alsbrook*, 469 F. Supp. 3d at 851. Plaintiff submits that Defendant MgBoh had a contractual obligation to act "responsibly, reasonably, and non-maliciously" when the recipient of the message approached her for advice on responding to the subject text message. (ECF No. 40, 10 ¶ 37.)  Plaintiff alleges that Defendant MgBoh violated this obligation by "sharing and posting to social media incomplete and misleading screenshots of the subject text message, doctored to include her own slanted commentary" with the end result that Ms. Foreman was "misrepresented as a racist to the Rhodes community."  (*Id.* ¶¶ 37-39.)  Defendants argue that Plaintiff's assumption that "it is more probable than not" that the recipient of the text message approached Ms. MgBoh for advice because of her status as a resident advisor is unsupported in the Complaint. As Defendants argue, it is simply not plausible that the message was sent to Ms. MgBoh in order to seek her advice as a resident advisor, rather than a friend, especially since the original recipient of the text lived off campus.  (ECF No. 41-1, 9.)  In addition, Defendant submits that "more probable than not" is not the correct pleading standard.  But even if it were, Plaintiff has still failed to plausibly state a breach of contract claim against Ms. MgBoh because the CSC Constitution is silent on obligations of resident advisors.  (ECF No. 41-1, 9.)  Defendants highlight Plaintiff's assertions

that the recipient of Plaintiff's text message lived off campus, and therefore, would have no reason to report anything to Ms. MgBoh in her capacity as an on-campus resident advisor. (ECF No. 41-1, 9.)  More importantly, Plaintiff has failed to sufficiently allege that the text message sent to Ms. MgBoh was because of her position of resident advisor.  In essence, Plaintiff asks this Court to speculate about the reason why the text was forwarded to Ms. MgBoh.  As Defendants assert, Plaintiff was not misrepresented as a racist from a screenshot of her text message; Plaintiff's text began with "Imma be racist".  She admitted being racist when she apologized to the student body, and during CSC hearing.  After reviewing and considering what occurred, the Court is having difficulty understanding how Plaintiff believes that she had been misrepresented as a racist when she in fact confirmed making the racist statement "if you see a Black man in the next 24 hours near your house hit him with your car."

As noted above, a Complaint must state a claim to relief that is plausible and allows a court to reasonably infer that a defendant is liable for the alleged misconduct.  *Iqbal,* 556 U.S. at 678.   The pleading standard of "more probable than not" is not the correct standard. Consequently, Count VI has failed to plausibly state a breach of contract claim against Ms. MgBoh.  The agreement between Rhodes College and Ms. Foreman was the CSC Constitution, which was substantially complied with by Rhodes College.   There is nothing in the CSC Constitution that imposes any obligations or duties on Rhodes College's Resident Advisors. Simply put, Plaintiff has failed to establish a connection between the CSC Constitution and Ms. MgBoh.   Any contractual obligations were between Plaintiff and Rhodes College.   Thus, Plaintiff has failed to show that a valid and enforceable contract existed between Plaintiff and Ms. MgBoh.  Even if a contractual relationship existed with Ms. MgBoh, Plaintiff admitted that she was being racist with her text message and that she was not trying to deflect blame.

Count VI is dismissed for failure to state a claim.

5. *Defendant Caddle (Count VII – Breach of Contract)*

As to Count VII, Plaintiff alleges that Defendant Caddle, as CSC President and a member of the Rhodes College community, had a contractual obligation to testify honestly in response to questions at the Appeals Committee hearing. (ECF No. 40, ¶¶ 14 & 40.) According to Plaintiff, Defendant Caddle breached that contractual obligation by telling the following "lies": (1) that Ms. Foreman was not crying when she was forced to enter pleas of responsible or not responsible to the charges; (2) that Ms. Foreman was given advance notice that she had to present the CSC with her evidence in advance of the hearing; and (3) that one of the accuser's was trembling in terror of Ms. Foreman while testifying at the hearing. (*Id.*)  Defendants respond that Plaintiff has again failed to allege any facts to support her claim.  Defendants argue that the CSC Constitution only requires the CSC President to meet with the Appeals Committee when an appeal is filed, which Defendant Caddle did. (ECF No. 41-1, 10.)   Defendants contend that whether Ms. Foreman was crying or not crying or whether an accuser was trembling or not trembling cannot have plausibly affected the outcome of the appeals hearing, which Ms. Foreman won. (*Id.*)

Upon review, besides Plaintiff's bare and unsupported statement, there is nothing to suggest that Defendant Caddle acted in bad faith in his testimony to the Appeals Committee as Plaintiff asserts.  Defendant Caddle informed Plaintiff that she could present evidence that would help her case during the appeal process, which she did.  (ECF No. 27-1, 8-9 ¶ 22-25 and 1-2.) The Appeals Committee agreed with Ms. Foreman that she should have been allowed to introduce her documentary evidence at the hearing even if she had not submitted it in advance. That additional documentary evidence ultimately was submitted and considered but did not change the outcome.  Thus, when viewing the factual assertions raised by Plaintiff as to this

count, the right to relief for any alleged contract claim does not rise above a speculative level. Therefore, Count VII is dismissed for failure to state a claim

### III.  False Light Publicity – Defendant MgBoh (Count VIII)

The final claim presented in Plaintiff's Amended Complaint alleges a claim for false light invasion of privacy against Defendant MgBoh. Under false light, "one who gives publicity to a matter concerning another that places the other before the public in a false light" is liable if "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Roe v. Amazon.com*, 714 F. App'x 565, 568–69 (6th Cir. 2017) (citing *Welling v. Weinfeld*, 113 Ohio St.3d 464, 866 N.E.2d 1051, 1059 (2007)).  Only those persons who have been placed in a false light may recover for invasion of their privacy. *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 601 (6th Cir. 2013).  A false light invasion of privacy claim requires a plaintiff to allege that "the false light in which the other was placed would be highly offensive to a reasonable person."  *Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816, 835 (M.D. Tenn. 2021).  Literal accuracy of separate statements will not render a communication true where the implication of the communication as a whole was false.  *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 317 (Tenn. Ct. App. 2012). In other words, "literal accuracy is not an outright defense to false light because plaintiff must allege the implication of the communication as a whole was false." (*Id.*)

Plaintiff argues that by "publicly posting certain of Plaintiff's text messages while deliberately omitting Plaintiff's profuse apology in which she stated her words had been unintentional, Defendant MgBoh intentionally presented her in a false public light." (ECF No.

26

47, 10.)  Plaintiff further asserts that she "was portrayed as a White person who would not admit to having been unintentionally offensive when confronted about her privilege and insensitivity by a Black person."  (*Id.*)  Defendants respond that Plaintiff did not allege how the omission of her apology rendered the screenshot as a whole "false".  (ECF No. 50, 7.)  Defendants submit that there are no allegations to plausibly support Plaintiff's claim that Ms. MgBoh's social media post was false, either literally or by implication.  (ECF No. 50, 7.)  Defendants finally argue that Ms. Foreman's initial text which began with "Imma be racist", combined with her response, actually validates the accuracy of the screenshot:

> "So yes if she sees someone suspicious on her street that matches the description I think she should report it. Not literally hit him with her car…But yes, the way I phrased what I said was racist and I should have thought more before I sent it. I am sorry as I try to be more respectful and understanding in how I view others but that was not the case here."

(ECF No. 1, ¶ 18.)

Plaintiff admitted the text message was racist and that she should have thought more about it before sending it.  Plaintiff issued a public apology acknowledging responsibility for the racist rhetoric and conceding that her action was nothing short of racist.  "I am so profoundly sorry for my ignorance and blatant display of racism in response to the tragedy that affected our campus this weekend. What I said was wrong and disrespectful to the Black community at Rhodes." (ECF No. 19-1, 9.)  On its face, the false light claim is not factually supported in the Complaint because the communication via text message that was disseminated was created by Plaintiff.  Ms. MgBoh only shared it with others.

Although the text message was sent to Defendant MgBoh, and then further disseminated, there is no dispute that racist rhetoric is serious and highly offensive to Defendant MgBoh and the Black community at Rhodes College as a whole.  Therefore, given the lack of falsity as to the

racist text message originally sent by Plaintiff, the Court finds there is no viable claim for false light invasion of privacy since relief is not plausible on its face. Plaintiff must allege the implication of the communication as a whole was false. Plaintiff has failed to meet this standard and Count VIII is dismissed for failure to state a claim.

### CONCLUSION

Plaintiff has provided the Court with a complete record of the disciplinary proceedings, including the Community Standards Council hearing, the outcome of Plaintiff's appeal to the Appeals Committee, and the reconsideration of the matter by the Community Standards Council upon remand from the Appeals Committee. The Committee Standards Council affirmed its original decision to suspend Plaintiff for one-semester, along with requiring sensitivity training. As noted above, Rhodes College substantially complied with the Constitution. It is disingenuous for Plaintiff to say with certainty that her racist text message did not cause Ms. Beatey to feel abused or harassed or that any Black member of the Rhodes College community did not fear that some physical harm could result.

Besides Plaintiff's bare and unsupported allegations, there is nothing in the record that suggests that the decision to discipline Plaintiff was arbitrary, capricious, or was founded in bad faith. The Court has reviewed the total disciplinary process and finds that the disciplinary process at Rhodes College provided basic fairness, and that there was substantial compliance with the terms of the CSC Constitution. Plaintiff's disappointment with the outcome of the disciplinary process is understandable but is not a valid basis to obtain relief. For the reasons stated above, the Court finds that Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Failure to State a Claim is **GRANTED**. (ECF Nos. 41 & 41-1.) Accordingly, the outstanding Motion for Temporary Restraining Order, (ECF No. 20), and Motion for Leave to Submit

Additional Statement of Facts in Support of Preliminary Injunction, (ECF No. 51), are hereby

**DENIED AS MOOT**.

      **IT IS SO ORDERED** this 17th day of August, 2022.

                                      ***s/John T. Fowlkes, Jr.***
                                      JOHN T. FOWLKES, JR.
                                      UNITED STATES DISTRICT JUDGE